UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHERYL YOUNG,

        Plaintiff,

   v.

PETER BUTTIGIEG,

        Defendant.

Case No.  19-cv-01411-JCS

**ORDER REGARDING MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Re: Dkt. No. 45

## I.  INTRODUCTION

Plaintiff Cheryl Young, pro se, brings this action asserting that Defendant Peter Buttigieg,[1] in his official capacity as Secretary of Transportation (the "Secretary"), discriminated against her based on race and age in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act of 1967 ("ADEA"), respectively.  After the Ninth Circuit reversed a previous order of dismissal based on the statute of limitations, Ms. Young filed her operative second amended complaint, and the Secretary moves once again to dismiss all of Ms. Young's claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Court held a hearing on Friday, March 12, 2021.  For the reasons explained below, the Secretary's motion is DENIED, except as to Ms. Young's claim that she was denied a particular position in 2016 and 2017 on account of her race, which is DISMISSED with leave to amend no later than April 9, 2021.[2]

---

[1] Buttigieg was confirmed as Secretary of Transportation while this case has been pending, and thus automatically substitutes as defendant for former Secretary of Transportation Elaine Chao under Rule 25(d) of the Federal Rules of Civil Procedure.
[2] The parties have consented to the jurisdiction of a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).  The case was previously assigned to the Honorable Elizabeth Laporte, and was reassigned to the undersigned upon Judge Laporte's retirement from the Court.

United States District Court
Northern District of California

## II.      BACKGROUND

### A.      Ms. Young's Employment History with DOT

Because a plaintiff's factual allegations are generally taken as true on a motion under Rule 12(b)(6), this section summarizes the allegations of Ms. Young's second amended complaint as if true.  Some of the following facts are also drawn from documents attached as exhibits to Ms. Young's complaint.  Nothing in this order should be construed as resolving any issue of fact that might be disputed at a later stage of the case.

Although not specifically alleged in the complaint, there is no dispute that Ms. Young is an Asian American woman who is now in her seventies.  *See* Mot. (dkt. 45) (citing evidence from earlier administrative proceedings).  She was hired by the Department of Transportation ("DOT") on May 18, 2001 as an Information Technology Specialist at the salary grade GS-14 and was expressly recruited for the "TranStats" project in the Bureau of Transportation Statistics ("BTS"), a unit of the DOT's Research and Innovative Technology Administration ("RITA").  2d Am. Compl. ("SAC," dkt. 44) ¶ 3 & n.1.  In May of 2004, Ms. Young was promoted to salary grade GS-15, after receiving public recognition for her successful work on TranStats.  *Id.* ¶ 4.  Starting in 2005, Ms. Young's TranStats team was situated in the BTS's Office of Airline Information ("OAI").  *Id.* ¶ 5.

Ms. Young alleges that in 2008, despite her early success with a new "E-Filing" project, the DOT replaced her with a fourteen– or fifteen-year younger Caucasian employee.  *Id.* ¶¶ 5–6, 41.  BTS Acting Director Steven Smith reassigned Ms. Young to another unit of the BTS, the Office of Geospatial Information System ("GIS"), where she worked from September 2008 to March 2015.  *Id.* at 5–6; *see also id.* ¶ 41.  Throughout her employment at GIS, she was tasked with "training and do[ing] entry level work most of the time" because GIS did not have work that was "commensurate with [her] experience, expertise, and grade."  *Id.* ¶ 6.  Her manager, Steven Lewis, had trouble tasking her for years after her reassignment because her expertise was not relevant to the work that was performed at GIS, which left her underutilized a majority of the time.  *Id.* ¶ 44.  This underutilization left Mr. Lewis unable to rate her any higher than a "3" in annual performance reviews.  *Id.*  Ms. Young felt humiliated and depressed due to the removal from her

2

1    previous position and doing entry-level work, negatively affecting her personal life and

2    necessitating medication.  *Id.* ¶ 45.

3           In March 2015, Ms. Young accepted a Voluntary Separation Incentive Payment ("VSIP")

4    offer and retired.  *Id.* ¶ 8.  In March 2016, pursuant to an order from the Office of Federal

5    Operations ("OFO") within the EEOC described in detail below, the DOT offered Ms. Young a

6    GS-15 Information Technology position to manage OAI IT automation.  *Id.* ¶ 9.  Following a 2017

7    OFO Decision on Clarification, also described in greater detail below, the DOT restarted

8    reinstatement and Ms. Young returned her VSIP.  *Id.* ¶ 10.  However, she did not return to the

9    position.  *Id.*  In her complaint, Ms. Young alleges that she understands she is currently on the

10   DOT payroll, but her employment status is "unclear."  *Id.* ¶ 11.[3]  In 2019, she received a

11   "voluntary retirement" form from human resources at the DOT.  *Id.* ¶ 12.

12         **B.    Underlying EEOC Proceedings**

13          On January 16, 2009, Ms. Young filed an EEO complaint against the DOT for

14   discrimination on the basis of age (at the time, 61), race (Asian), and reprisal for prior protected

15   activity.  SAC ¶ 14 & Ex. 32.  After the investigation into her claims, Ms. Young requested a

16   hearing before an EEOC Administrative Judge ("AJ").  *Id.* ¶ 14.  On April 7, 2011, the DOT

17   submitted a motion for summary judgment, which the AJ denied because of "issues of credibility

18   and of fact whether the Agency's explanation for its actions are a pretext for discrimination."  *Id.* ¶

19   16 & Ex. 20 at 96.  After conducting a hearing in August of 2012 or 2013,[4] the AJ issued a

20   decision in favor of Ms. Young in 2014, concluding that she had established race, age, and reprisal

21   discrimination as alleged.  *Id.* ¶ 18.  The AJ issued an Order for Remedial Relief, including

22   restoring Ms. Young to her position in OAI retroactive to September 9, 2008, as well as awarding

23   Ms. Young $60,000 in compensatory damages and her attorney's fees.  *Id.* ¶ 18 & Ex. 24.  On

24   April 7, 2014, the DOT submitted an appeal.  *Id.* ¶ 19.

25

26

27   ───────────────
     [3] At the hearing, Ms. Young stated that, since 2017, she has not received regular pay from the
     DOT and has instead received pension income.

28   [4] Ms. Young alleges that the hearing occurred in 2012, SAC ¶ 18, but the EEOC's later decision
     on clarification states that the hearing occurred in 2013, *id.* Ex. 32 at 2.

United States District Court
Northern District of California

1              **1.      The 2015, 2016, and 2017 OFO Orders**

2          On September 16, 2015, the Equal Employment Opportunity Commission ("EEOC")

3    Office of Federal Operations ("OFO") issued its decision on appeal, affirming the AJ's finding of

4    discrimination and the remedies awarded. *Id.* ¶ 19 & Ex. 27.  On October 21, 2015, the DOT

5    submitted a request for reconsideration, which the OFO denied on February 23, 2016. *Id.* ¶ 20 &

6    Ex. 28.  The OFO directed the DOT to "restore [Ms. Young] to her position in the Bureau of

7    Transportation Statistics, Office of Airline Information (or its current organizational equivalent)

8    retroactive to September 9, 2008." *See* dkt. 44-28 at 4.

9          On March 10, 2016, the DOT offered Ms. Young a GS-15 Specialist position, which she

10   accepted on the same day. *Id.* ¶ 21 & Ex. 29.  However, Ms. Young was unable to report to the

11   position because on April 12, 2016, the DOT submitted a petition for clarification to the OFO. *Id.*

12   ¶ 22.  In briefing, the DOT argued that because Ms. Young had voluntarily retired, the DOT

13   should not be required to restore her to an equivalent position or pay back pay, interest, and other

14   benefits. *See id.* Ex. 40 at 2.  On February 1, 2017, the OFO issued a decision in response to the

15   DOT's petition for clarification, concluding that the DOT was obligated to comply with the

16   September 16, 2015 order and to restore Ms. Young to her position in OAI or to "the equivalent

17   position" that she was offered and accepted in March 2016. *See id.* ¶ 24 & Ex. 32 at 4.  In

18   addition, the decision awarded Ms. Young back pay, benefits, and interest from September 9,

19   2008, to the effective date of her reinstatement with the agency or her refusal of a reinstatement

20   offer. *See id.*

21         On March 3, 2017, the DOT offered Ms. Young a position it determined to be equivalent

22   to the position it had previously offered her in March 2016; a GS-2210-15, Step 10 position as a

23   TranStats Manager Information Technology Specialist (System Analysis) in OAI.  *See id.* Ex. 40

24   at 3.  In a response on March 17, 2017, Ms. Young disagreed that the offered position was

25   equivalent to her prior offer or original position. *Id.* Ex. 40 at 4.  On May 2, 2017, the DOT

26   processed a $124,868.94 payment to Ms. Young that was intended to cover back pay, benefits, and

27   interest from April 1, 2015 until March 1, 2017. *Id.* Ex. 40 at 5.  The DOT did not provide any

28   front pay. *Id.* Ex. 40 at 6.  Ms. Young alleges that during this time she was passed over for the

United States District Court
Northern District of California

4

United States District Court
Northern District of California

GS-15 IT Specialist Position for OAI Automation, and that the position was given to younger employees both after it was first offered to Ms. Young in 2016 (when the DOT's petition for clarification prevented her from taking it), and again in 2017 when the first employee to take that position was transferred to a different office. *Id.* ¶¶ 25, 91, 92.

On March 20, 2018, Ms. Young filed a petition for enforcement with the EEOC seeking to compel the DOT to provide back pay retroactive to 2017 and either reinstate her to a comparable position or provide front pay. *Id.* ¶ 26. In response, the DOT argued that since the TranStats Manager position offered in March 2017 was "essentially" the same as the position it had offered in March 2016, it had complied with the February 2017 OFO Order. *Id.* Ex. 40 at 5. Ms. Young countered that in lieu of reinstatement she wanted three years of front pay and that she disagreed that the job she was offered was equivalent. *Id.* Ex. 40 at 5–6.

## 2. The November 2018 Order and the December 2018 Errata

The OFO granted in part Ms. Young's petition for enforcement on November 30, 2018. *Id.* ¶ 27 & Ex. 40 at 9. This order concluded that Ms. Young had been offered an equivalent position on March 3, 2017, and that she rejected the offer on March 17, 2017, and was thus not entitled to any front pay (which compensates an individual when reinstatement is not possible in limited circumstances). *Id.* ¶¶ 29, 33 & Ex. 40 at 7. The decision was based on an examination of the record evidence, including emails between Ms. Young and a comparison of the position descriptions for the position offered in 2017 and Ms. Young's 2008 position. *Id.* Ex. 40 at 7. Based on this evidence, the OFO found Ms. Young's characterization of the 2017 position—as a low-level, administrative job—to be inaccurate in that it involved the same data systems that she had previously worked on in 2008. *Id.* It also found no indication that the position "lacked autonomy, or was not comparable to the prior position," as Ms. Young had contended. *Id.* The OFO also dismissed Ms. Young's claim that a different position, which Ms. Young found desirable, would have been more on part with her prior position, finding that the order required an equivalent, not a "desired," position." *Id.* The OFO stated that the position offered in 2017 was modified after the DOT made the offer in an effort to "find and/or craft a position that would be equivalent, and suitable to [Ms. Young]." *Id.* Ex. 40 at 8. Ms. Young alleges that the OFO erred

1   in that determination—in her view, the position offered in 2017 was not equivalent to her former

2   role, and she did not reject the offer, but instead only disputed the equivalency of the position and

3   asked to discuss the matter further.  *Id.* ¶¶ 28–33.

4        The OFO determined that Ms. Young was not eligible for the front pay she requested.  *Id.*

5   Ex. 40 at 8.  The OFO also found that Ms. Young was entitled to back pay, benefits, and interest

6   covering the two-week period after she was offered the position but before she rejected it—that is,

7   from March 2, 2017 through March 17, 2017.  *Id.* Ex. 40 at 8–9.  Finally, the OFO instructed the

8   DOT to produce records of payment to Ms. Young of back pay, interest, and benefits from

9   September 8, 2008 to April 1, 2015, or to make payment to Ms. Young in the appropriate amount

10  within 30 days.  *Id.* Ex. 40 at 9.  It further directed the DOT to submit a "report of compliance in

11  digital format," including evidence that the corrective action was implemented.  *Id.*

12       The OFO's order on the petition for enforcement also informed Ms. Young of her appeal

13  rights.  *Id.* Ex. 40 at 10–11.  First, it advised Ms. Young of the right to file a petition with the

14  EEOC to enforce compliance.  *Id.* Ex. 40 at 10.  Second, it stated that she had the right to file a

15  civil action to enforce compliance within ninety days of receiving the order.  *Id.* Ex. 40 at 11.  It

16  additionally stated, erroneously, that Ms. Young had a right to seek reconsideration of the Final

17  Order.  *Id.* Ex. 40 at 10.  To correct the error regarding the right to reconsideration, two weeks

18  later, on December 14, 2018, the OFO issued an "errata."  *See id.* Ex. 41.  The errata is a two-page,

19  standalone document, dated December 14, 2018, that stated:

20       Attached please find a corrected copy of the above-captioned
    decision.  The original decision, issued on November 30, 2018,
21       inadvertently included a paragraph on page 10 providing for the right
    to request reconsideration of the decision.  However, the [November
22       30, 2018] decision is the final decision.  This correction in no way
    alters the substantive content of the decision.
23

24  *Id.*  Attached was a corrected copy of the OFO's order, still dated November 30, 2018, that

25  omitted information about the right to seek reconsideration but was otherwise identical to the

26  original order.  *See id.*

27       In conjunction with an earlier motion to dismiss for lack of subject matter jurisdiction, the

28  Secretary submitted an April 5, 2019 letter from the OFO indicating that the OFO's compliance

United States District Court
Northern District of California

1   monitoring in her case had ceased because "[t]he [DOT] has provided us documentation sufficient

2   to demonstrate that it has taken the corrective actions ordered in the Commission's decision." *See*

3   1st Mot. to Dismiss (dkt. 15) Ex. 2.

4       **C.   Procedural History and Previous Order**

5       Ms. Young initially filed this action pro se.  The case was assigned to the Honorable

6   Elizabeth Laporte.  The Secretary moved to dismiss, and the Court granted dismissal with

7   prejudice and without leave to amend pursuant to Rule 12(b)(1), or alternatively pursuant to Rule

8   12(b)(6), because Ms. Young's claims were barred by the statute of limitations.  *See* Order

9   Granting Def.'s Mot. to Dismiss (dkt. 31).[5]  After Judge Laporte retired from the Court, the case

10  was reassigned to the undersigned magistrate judge in October of 2019.  *See* dkt. 34.

11      Ms. Young appealed, and the U.S. Court of Appeals for the Ninth Circuit affirmed the

12  decision to dismiss the complaint (which sought to enforce the EEOC's final order) because the

13  DOT had complied with that order, but reversed the denial of leave to amend, holding that Ms.

14  Young should be permitted to amend her complaint to pursue de novo review of the EEOC's

15  decision if Ms. Young can allege that she received the EEOC's December 14, 2018 errata and

16  corrected final decision within ninety days before she brought this action.  *See Young v. Chao*, 816

17  F. App'x 154 (9th Cir. 2020).[6]  The Ninth Circuit's decision relied on *Carver v. Holder*, 606 F.3d

18  690 (9th Cir. 2010), which held that a plaintiff who prevailed on liability in administrative

19  proceedings but was unsatisfied with the EEOC's decision on a petition for enforcement (where,

20  as here, the EEOC concluded that the defendant agency had complied with its previous order and

21  no further action was necessary) could not "parse his action to increase the remedy without

22  relitigating the liability issue in pursuing his claim in federal court."  606 F.3d at 692.

23      Ms. Young filed her first amended complaint (dkt. 41) on November 6, 2020, and by

24  stipulation of the parties, she filed her operative second amended complaint on December 7, 2020.

25  In it, she raises claims under Title VII and the ADEA for race and age discrimination, hostile work

26

27  [5] *Young v. Chao,* No. 19-cv-01411-EDL, 2019 WL 11555250 (N.D. Cal. Aug. 27, 2019), *aff'd in part, vacated in part, remanded*, 816 F. App'x 154 (9th Cir. 2020).

28  [6] The Ninth Circuit's decision is filed in this Court's docket as docket entry 37, and its mandate issued on October 5, 2020 is filed as docket entry 38.

United States District Court
Northern District of California

1   environment, and retaliation, seeking de novo review of the administrative decision.  *See generally*

2   SAC ¶¶ 40–94.  She seeks the following relief: (1) compensatory damages in the amount of

3   $60,000; (2) reinstatement to the OAI IT modernization project with backpay retroactive to

4   September 9, 2008; and (3) costs and fees. *Id.* ¶¶ 95–97.  The Secretary now moves once again to

5   dismiss. *See generally* Mot.

6       **D.    Claims and Arguments**

7       Ms. Young asserts five claims against the Secretary.  *See generally* SAC.  Her first claim

8   alleges that her reassignment to GIS was an adverse employment action motivated by age and race

9   discrimination in violation of Title VII and the ADEA.  *Id.* ¶ 40.  Her second claim alleges that

10  harassment on account of age and race, culminating in her reassignment, created a hostile work

11  environment in violation of Title VII and the ADEA. *Id.* ¶ 59.  Her third claim alleges that

12  "stopping [her] from working on tasks in the SharePoint Project constituted reprisal for protected

13  EEO activity." *Id.* ¶ 80.  Her fourth claim alleges that the DOT's VSIP offer targeting her

14  demoted position triggered constructive retirement in violation of Title VII and the ADEA.  *Id.*

15  ¶ 83.  Her fifth and final claim alleges that the DOT's non-selection of Ms. Young for the GS-15

16  IT Specialist Position for OAI Automation in 2016 and 2017 were a continuation of the 2008

17  adverse employment action as well as new instances in violation of Title VII and the ADEA.  *Id.* ¶

18  90.

19      The Secretary moves to dismiss all of Ms. Young's claims on the basis they fail to

20  adequately plead causes of action under Title VII and the ADEA, and argues that her fourth and

21  fifth claims also do not satisfy those statutes' administrative presentment requirements.  *See* Mot.

22  at 1, 10.  The Secretary argues that the fourth and fifth claims should be dismissed with prejudice

23  because the defect in presentment cannot be cured.  *Id.*

24  **III.    ANALYSIS**

25      **A.    Legal Standard**

26      A complaint may be dismissed for failure to state a claim on which relief can be granted

27  under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "The purpose of a motion to dismiss

28  under Rule 12(b)(6) is to test the legal sufficiency of the complaint."  *N. Star Int'l v. Ariz. Corp.*

United States District Court
Northern District of California

1    *Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a claimant's burden at the pleading stage

2    is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which

3    sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing

4    that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

5            In ruling on a motion to dismiss under Rule 12(b)(6), the court takes "all allegations of

6    material fact as true and construe[s] them in the light most favorable to the non-moving party."

7    *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  Dismissal may be based on a

8    lack of a cognizable legal theory or on the absence of facts that would support a valid theory.

9    *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A pleading must "contain

10   either direct or inferential allegations respecting all the material elements necessary to sustain

11   recovery under some viable legal theory."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007)

12   (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  "A pleading

13   that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action

14   will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

15   "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"

16   *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Nor does a

17   complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*,

18   556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Rather, the claim must be "'plausible on its

19   face,'" meaning that the claimant must plead sufficient factual allegations to "allow the court to

20   draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting

21   *Twombly*, 550 U.S. at 570).

22           Pro se pleadings are generally liberally construed and held to a less stringent standard.  *See*

23   *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Even post-*Iqbal*, courts must still liberally construe

24   pro se filings.  *Hebbe v. Pliler*, 627 F.3d 338 (9th Cir. 2010).  As the Ninth Circuit explained:

25   "[w]hile the standard is higher, our obligation remains, where the petitioner is pro se, particularly

26   in civil rights cases, to construe the pleadings liberally and to afford the petitioner the benefit of

27   any doubt."  *Id.* at 342.  Nevertheless, the Court may not "supply essential elements of the claim

28   that were not initially pled."  *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th

United States District Court
Northern District of California

1    Cir. 1982).

2         If the Court dismisses a complaint under Rule 12(b)(6), it should "grant leave to amend

3    even if no request to amend the pleading was made, unless it determines that the pleading could

4    not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th

5    Cir. 2000) (en banc) (internal quotation marks and citations omitted).

6         **B.    Claim I: Discrimination by Reassignment**

7         Ms. Young alleges that her reassignment to GIS was a tangible and adverse employment

8    action motivated by age and race discrimination in violation of Title VII and the ADEA.  SAC

9    ¶ 40.

10        **1.    Legal Standard for Title VII and ADEA Discrimination Claims**

11        Title VII makes it an "unlawful employment practice for an employer to fail or refuse to

12   hire or to discharge any individual, or otherwise to discriminate against any individual, or

13   otherwise to discriminate against any individual with respect to his compensation, terms,

14   conditions, or privileges of employment, because of such individual's race," among other

15   protected categories.  42 U.S.C. § 2000e-2.

16        To establish a prima facie case of disparate treatment discrimination under Title VII—in

17   other words, a case that she was treated unfairly *because of* her race—Ms. Young must show that:

18   (1) she belongs to a protected class; (2) she was qualified for her position; (3) she was subject to

19   an adverse employment action; and (4) similarly situated individuals outside her protected class

20   were treated more favorably.  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).

21   Similarly, to plead a prima facie case of an ADEA violation, a plaintiff must allege that: (1) she

22   was at least forty years old; (2) she was performing her job satisfactorily; (3) she suffered an

23   adverse employment action,; and (4) she was "either replaced by [a] substantially younger

24   [employee] with equal or inferior qualifications *or* discharged under circumstances otherwise

25   giving race to an inference of age discrimination." *Sheppard v. David Evans & Assoc.*, 694 F.3d

26   1045, 1049 (9th Cir. 2012) (emphasis and alteration in original) (citation and internal quotation

27   marks omitted).  "An inference of discrimination can be established by showing that the employer

28   had a continuing need for the employee['s] skills and services in that their various duties were still

United States District Court
Northern District of California

10

1    being performed . . . or by showing that others not in their protected class were treated more

2    favorably." *Id.* at 1049–50.

3         In the context of summary judgment, which this case has not yet reached, courts "analyze

4    plaintiffs' Title VII claims through the burden-shifting framework of *McDonnell Douglas Corp. v.*

5    *Green*, 411 U.S. 792 . . . (1973)," under which a plaintiff must first present a prima facie case of

6    discrimination, the burden then shifts to the defendant "to articulate some legitimate,

7    nondiscriminatory reason for the challenged action," and if the defendant does so, the plaintiff

8    "must then raise a triable issue of material fact as to whether the defendant's proffered reasons . . .

9    are mere pretext for unlawful discrimination." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151,

10   1155 (9th Cir. 2010) (citations and internal quotation marks omitted).  The *McDonnell Douglas*

11   framework does not apply at the pleading stage. *Austin v. Univ. of Or.*, 925 F.3d 1133, 1137 (9th

12   Cir. 2019) (considering a claim for sex discrimination in education under Title IX, which applies

13   the same standard). The Supreme Court so held in *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506,

14   511 (2002), and the Ninth Circuit has reaffirmed that rule after the Supreme Court's decisions in

15   *Iqbal* and *Twombly* setting forth the "plausibility" pleading standard, including in *Austin*.  *See* 925

16   F.3d at 1136–37.  Notably, the rejection of *McDonnell Douglas* at the pleading stage is not limited

17   to its burden-shifting framework, which is plainly inapplicable, but *Swierkiewicz* and *Austin* also

18   hold that a plaintiff's allegations need not track each element of a prima facie case.  *See id.*

19   (quoting *Swierkiewicz*, 534 U.S. at 511).  That said, a plaintiff's complaint still must include

20   "sufficient, nonconclusory allegations plausibly linking the [adverse] action to discrimination" or

21   retaliation.  *Id.* at 1138.

22              **2.     Allegations Regarding Reassignment**

23         Here, Ms. Young alleges that Steven Smith, Acting Director of BTS, reassigned her from

24   OAI to GIS in 2008 and recommended or selected Rachael Taylor, a fourteen– or fifteen-year

25   younger Caucasian GS-14, to take over her TranStats responsibilities, including management of

26   the E-Filing Project.  SAC ¶¶ 5–6, 41.  Ms. Young contends that Ms. Taylor was less qualified not

27   only in grade level but in knowledge of database design, experience in project management, and

28   familiarity with the DOT's IT systems.  *Id.*  Ms. Young alleges that her reassignment was an

United States District Court
Northern District of California

1    adverse employment action, as her "responsibilities changed from a Manager of a major IT project

2    to an 'entry-level' staff member in GIS." *Id.* ¶ 43–44.  Due to this reassignment, Ms. Young

3    contends that her new supervisor at GIS could not task her appropriately for years because her

4    expertise was not relevant to the work that GIS performed, and thus was unable to give her strong

5    performance reviews.  *Id.*

6            She also alleges that non-discriminatory reasons proffered by the DOT were pretext.  *Id.* ¶

7    46.  Specifically, she contends that in September 2008, Mr. Smith announced her reassignment to

8    GIS based on "GIS's need for server upgrade."  *See id.* ¶ 48 (citing *id.* Ex. 4).  However, Mr.

9    Lewis, GIS Director, "pointed out that [the] GIS server upgrade was handled by RITA IT and his

10   office already had a GS-14 managing the task."  *Id.* (citing *id.* Ex. 16 at 78).  Ms. Young alleges

11   that during the DOT's EEO investigation in November of 2009, "Mr. Smith changed his 'reasons'

12   to the following": "[t]o help GIS develop a web-based tool for airline data," *id.* ¶¶ 49– 50 (citing

13   *id.* Ex. 9 at 4); "[t]o help ease 'short-staffed' GIS," *id.* ¶ 51 (citing *id.* Ex. 16 at 25); and "to

14   reassign OAI employees as decided by RITA Management," *id.* ¶ 52 (citing *id.* Ex. 9 at 3).  Ms.

15   Young contends that later, however, Mr. Smith began citing her skillsets and performance as

16   reasons for her reassignment, including during discovery in 2011.  *Id.* ¶¶ 53, 55.[7]  Ms. Young

17   contends that the "assessment of appropriate IT skillsets" was a pretext for discrimination, and

18   DOT management provided no "evidence that any serious assessment of [her] individual skillsets

19   had ever been made."  *Id.* ¶ 54; *see also id.* ¶ 56 (alleging that Mr. Smith was unable to provide

20   specific examples of purported issues with performance).  According to Ms. Young, her strong

21   performance had been recognized by other supervisors and stakeholders, and Mr. Smith admitted

22   that her performance reviews did not support his criticism.  *Id.* ¶ 56 (citing *id.* Ex. 24 at 4).

23           Ms. Young alleges that the AJ questioned Mr. Smith's credibility and concluded that his

24   _____

25   [7] In the DOT's Interrogatory Responses in response to Order to Compel, Mr. Smith stated that
     ". . . past project performance by [Ms. Young] was also considered in the reassignment.  In her
26   work with the airline program, [Ms. Young] did not share information on her projects, was
     quarrelsome in team meetings, failed to initiate GS-15 level problem solving skills, relied
27   exclusively on contractor staff to carry out her assignments, made it difficult to have TranStats
     contractors participate in critical planning sessions and, despite repeated guidance, failed to
28   coordinate her communications involving outside customers with agency management."  *See* SAC
     Ex. 15 at 2).

*United States District Court*
*Northern District of California*

explanation for reassigning Ms. Young "'cannot be believed and that more likely than not, he was motivated by discriminatory animus'" based on Ms. Young's race and age when he reassigned her to GIS.  *Id.* ¶ 57 (quoting *id.* Ex. 24 at 9).  She notes that the OFO's Decision on Appeal affirmed the AJ's finding of discrimination.[8]  *Id.* ¶ 58.

### 3.   Ms. Young States an ADEA Claim Based on Reassignment

The Secretary moves to dismiss only the ADEA component of Ms. Young's discrimination claim based on reassignment, without addressing her claim that the reassignment violated Title VII.  *See* Mot. at 16–17.

The Secretary argues that although the record evidence attached as exhibits to Ms. Young's complaint includes her date of birth, Ms. Young does not explicitly plead that she was at least forty years old.  *Id.* at 16.  This is a frivolous argument.  The Secretary's own motion opens by acknowledging that Ms. Young is seventy-four years old.  *Id.* at 2.  Ms. Young was in her sixties—well over the ADEA's threshold age of forty—when she was reassigned in 2008.  Requiring Ms. Young to amend her complaint to specifically allege her age, when her date of birth and age appear in exhibits to the complaint (*e.g.*, SAC Ex. 14 at 2, Ex. 21 at 2 n.2, Ex. 32 at 1) and no party disputes her age, would serve no purpose and would contravene at least the liberal standard applied to pro se complaints, if not also the general pleading standard of Rule 8 and *Twombly*.

The Secretary also argues that Ms. Young fails to plead facts that indicate that she suffered the alleged adverse employment action, the reassignment to GIS, under circumstances giving rise to an inference of age discrimination.[9]  Mot. at 16–17.  Specifically, the Secretary argues that the

---

[8] "In the instant case, we find substantial evidence supports the AJ's finding of discrimination and award of remedies . . . We further concur with the AJ that [Ms. Young]'s reassignment was a tangible employment action, as well as an adverse action, that establishes [Ms. Young]'s harassment claim.  We find that S3 [Mr. Lewis] did not consider the unclassified tasks to which [Ms. Young] was assigned and the work S2 [Mr. Smith] suggested for [Ms. Young] to be either grade-sustaining or desirable.  S3 considered the work to be entry level work.  We find the evidence further establishes that [Ms. Young]'s responsibilities for the TranStats database were assumed by a younger, Caucasian employee, whether or not that employee (E1 [Ms. Taylor]) was given [Ms. Young]'s job title and the balance of [Ms. Young]'s prior duties."  SAC Ex. 27 at 8.
[9] The Secretary does not concede that the reassignment to GIS constituted an adverse employment action and notes in a footnote that Ms. Young's characterization of her reassignment as an

United States District Court
Northern District of California

1   mere allegation that she was replaced by a younger employee with allegedly inferior qualifications

2   does not give rise to an inference of age discrimination.  *Id.*

3          In *Sheppard*, however, the plaintiff's allegation that her five "younger comparators kept

4   their jobs" was sufficient to give rise to an inference of discrimination because it plausibly

5   suggested a continuing need for the plaintiff's skill and services, as her various duties were still

6   being performed.  *Sheppard*, 694 F.3d at 1050.  After noting the brevity of the plaintiff's

7   complaint, the Ninth Circuit stated that in a "straightforward" case of discrimination, even after

8   *Twombly* and its progeny, the plaintiff's allegation that "she was over forty and received

9   consistently good performance reviews, but was nevertheless terminated from employment while

10  younger workers in the same position kept their job" amounted to an "entirely plausible scenario"

11  of employment discrimination.  *Sheppard*, 694 F.3d at 1050.  The same applies here.

12         As discussed above, there is no dispute that Ms. Young was over forty years old.  In

13  addition, Ms. Young alleges that she received consistently good performance reviews and her

14  TranStats project won several prestigious awards, but she was nevertheless reassigned to a new

15  department for which she was underutilized while a significantly younger employee with allegedly

16  inferior qualifications "replaced" her.  *See* SAC ¶¶ 4–6.  Taken in light most favorable to Ms.

17  Young, these allegations support an inference that she was "replaced by [a] substantially younger

18  [employee] with equal or inferior qualifications."  *Sheppard*, 694 F.3d at 1049.  Moreover, while

19  the Court does not reach the question of whether any administrative decision will be entitled to

20  deference on the merits of this case, the AJ's decision (affirmed by the OFO) that Ms. Young's

21  reassignment constituted discrimination based on age—which the AJ based on a thorough analysis

22  of Ms. Young's supervisor's credibility—tends to support at least the plausibility of her

23  allegations.  *See id.* Ex. 24 at 9, 17, Ex. 27 at 8.

24         Accordingly, Ms. Young has pled sufficient facts to allege a plausible claim under the

25

26  ─────────────────

    adverse employment action" calls for a legal conclusion.  Mot. at 16 n.2.  The Court construes that

27  footnote merely as preserving an argument for a later stage of the case, not seeking dismissal on
    that basis.  *Cf. United States v. Strong*, 489 F.3d 1055, 1060 n.4 (9th Cir. 2007) ("'The summary

28  mention of an issue in a footnote, without reasoning in support of the appellant's argument, is
    insufficient to raise the issue on appeal.'" (citation omitted)).

United States District Court
Northern District of California

1  ADEA.  The Secretary's motion to dismiss Ms. Young's age discrimination claim based on her

2  2008 reassignment is DENIED.

3      ### C.      Claim II: Hostile Work Environment

4      In Ms. Young's second cause of action, she alleges that her reassignment was the

5  culmination of a pattern of harassment based on age and race that created a hostile work

6  environment in violation of Title VII and the ADEA.  SAC ¶¶ 59–79.

7              #### 1.      Legal Standard for Hostile Work Environment Claims

8      To state a claim for hostile work environment on the basis of race under Title VII, a

9  plaintiff must allege that: (1) she was subjected to unwelcome verbal or physical conduct because

10 of her race; and (2) that the conduct was sufficiently severe or pervasive to alter the conditions of

11 her employment and create an abusive work environment.  *Manatt v. Bank of America*, 339 F.3d

12 792, 798 (9th Cir. 2003).

13     To determine whether conduct was sufficiently severe or pervasive to violate Title VII,

14 courts look to the totality of the circumstances.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23

15 (1993).  Occasional or isolated incidents are not actionable; rather, a plaintiff must show a

16 concerted pattern of harassment of a repeated, routine, or generalized nature.  *Faragher v. City of*

17 *Boca Raton*, 524 U.S. 775, 788 (1998); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th

18 Cir. 2004); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994).  "The working

19 environment must both subjectively and objectively be perceived as abusive."  *Vasquez v. Cty. of*

20 *Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003) (quoting *Brooks v. City of San Mateo*, 229 F.3d

21 917, 923 (9th Cir. 2000)).

22     Subjectively, the evidence must show that the harassment is sufficiently severe or

23 pervasive to alter the conditions of the victim's employment and create an abusive working

24 environment.  *McGinest*, 360 F.3d at 1113.  The Supreme Court has followed a "middle path"

25 with regard to the level of hostility or abuse necessary to establish a hostile work environment.

26 *McGinest*, 360 F.3d at 1113 (citing *Harris*, 510 U.S. at 21).  "It is enough 'if such hostile conduct

27 pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her

28 work, and to desire to take on in her position.'"  *Id.*  (quoting *Steiner*, 25 F.3d at 1463).

15

1   Objectively, courts look at "all the circumstances," including "the frequency of the

2   discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

3   offensive utterance; and whether it reasonably interferes with an employee's work performance."

4   *Harris*, 510 U.S. at 23; *McGinest*, 360 F.3d at 1113.  The analysis is made from the perspective of

5   a reasonable person "with the same characteristics as" the plaintiff.  *Craig v. M & O Agencies,*

6   *Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007).  The required level of severity varies inversely with the

7   pervasiveness or frequency of the conduct.  *See Harris*, 510 U.S. at 23.

8   The standard under the ADEA for a hostile work environment claim based on age is

9   substantially similar.  *See e.g.*, *Sai v. H & R Enterprises, Inc.*, Civ. No. 09–00154 SOM-BMK,

10   2010 WL 520633, at *7 (D. Haw. Feb. 11, 2010) (citing *Freitag v. Ayers*, 468 F.3d 528, 539 (9th

11   Cir. 2006); *Hardage v. CBS Broadcasting Inc.*, 427 F.3d 1177, 1187 (9th Cir. 2005)).

### 2.   Ms. Young States a Hostile Work Environment Claim

13   The Secretary contends that Ms. Young's hostile work environment allegations are

14   deficient as they do not plausibly plead that the alleged actions subjected Ms. Young to unwanted

15   verbal or physical conduct because of her race or age and any such occurrences are not sufficiently

16   severe or pervasive to alter the conditions of her employment and create an abusive environment.

17   *See* Mot. at 19; *see also Manatt*, 339 F.3d at 798.

18   Ms. Young contends that under Mr. Smith's tenure, minority employees in OAI were rated

19   starkly lower, which the AJ and OFO Decision on Appeal affirmed, finding that the rating pattern

20   was additional evidence that established Mr. Smith's bias against Asians in the office.  SAC ¶ 61.

21   In addition, Ms. Young alleges that Mr. Smith condoned and supported a series of incidents of

22   harassment in OAI which prevented her from working normally on the E-Filing and TranStats

23   projects.  *Id.* ¶ 63.  Ms. Young describes these allegedly harassing incidents in paragraphs 64

24   through 79 of her second amended complaint.  She contends that Mr. Smith further cited such

25   incidents below against her in discovery as "reasons" to reassign her.  *Id.*  They include the

26   following:

27   -   An alleged June 2008 incident involving a denial of Ms. Young's request for a briefing

28   on "critical information" before a contractor manager left OAI.  *Id.* ¶ 65.

16

- An alleged August 2008 incident involving an inability on Ms. Young's part to obtain "proprietary information" that Ms. Young's supervisor did not believe the contractor company was allowed to share with Ms. Young. Ms. Young alleges that her supervisor's statement about the nature of the information was "false," as it later turned out that her supervisor did not provide it to her because "he did not have time to ask for it." *Id.* ¶ 67.

- An early September 2008 incident in which Ms. Young alleges that Sharon Herman, who was "in charge of airline on-time data," "refused" to come to a meeting with Ms. Young. *Id.* ¶ 69. Her supervisor then, in response, "promised to 'schedule a meeting.'" *Id.* Ms. Young alleges that instead of having the meeting, he reassigned her. *Id.*

- An isolated incident of two colleagues "mocking" Ms. Young's ability to write in English. *Id.* ¶ 71. She states, "[t]his kind of mocking and belittling minority employees was tolerated and condoned by Mr. Smith." *Id.* ¶ 72.

- A further allegation that false statements, accusing Ms. Young of violating security protocol, were made with regard to her intentions to work on the weekend by her supervisor. *Id.* ¶ 76.

- An alleged statement by her supervisor, Mr. Smith, that OAI staff had "high moral"[10] after two Asian American managers, one of whom was Ms. Young, left the division, which Ms. Young interpreted as encouraging a hostile work environment. *Id.* ¶ 78. In support of this statement, she points to written discovery responses from the case before the EEOC in which "Mr. Smith did not deny that he made such a statement (though he explained that the quote was not 'accurate')." *See id.* (citing *Id.* Ex. 12 at 5).

The Secretary argues that many of these allegations make no reference to Ms. Young's age or race, and as such, they do not plausibly plead that the alleged actions subjected Ms. Young to

---

[10] Sic, presumably intended as "morale," although it is not clear if the error stems from Mr. Smith's original statement.

1    unwanted verbal or physical conduct because of her membership in a protected class.  Mot. at 19.

2    While some of these incidents do not include a clear link to Ms. Young's age or race, Ms. Young's

3    plausible claim that Mr. Smith reassigned her on account of her age and race, as discussed above,

4    tends to support an inference that his other alleged hostile conduct towards her was motivated by

5    similar animus.  The AJ's conclusion on a full factual record that Ms. Young experienced

6    harassment based on her race, which the OFO affirmed (and also attributed to Ms. Young's age),

7    also supports the plausibility of her allegations.  *See* SAC Ex. 24 at 10, Ex. 27 at 4–5.

8         The Secretary argues that occurrences such as not permitting an employee to attend

9    meetings or access certain information are not unusual happenings in a workplace, and thus are not

10   sufficiently severe or pervasive to alter the conditions of Ms. Young's employment and create an

11   abusive working environment.  Mot. at 19 (citing *Manatt*, 339 F.3d at 798).  *Manatt*, the Ninth

12   Circuit case on which the Secretary primarily relies, is distinguishable.  There, the Ninth Circuit

13   concluded that "two regrettable incidents occurring over a span of two-and-a-half years, coupled

14   with the other offhand remarks made by [the plaintiff's] co-workers and supervisor, did not alter

15   the conditions of [her] employment."  339 F.3d at 799.

16        Here, however, Ms. Young alleges a more pervasive pattern of harassment.  Allegations of

17   incidents that alone might be relatively minor but—when taken together—assert a broader pattern

18   can be sufficient to support a hostile work environment claim.  *See, e.g.*, *Landucci v. State Farm

19   Ins. Co.*, 65 F. Supp. 3d 694, 704–05 (N.D. Cal. 2014) (declining to dismiss a hostile work

20   environment claim where the plaintiff alleged that her supervisor commented on her choice of

21   clothing several times while not commenting on the clothing of male employees, and treated her

22   differently than her male-coworkers by consistently micromanaging and criticizing her work,

23   among other conduct); *Rico v. Jones Lang LaSalle Americas, Inc.*, No. CV 14-1322-GHK (JEMx),

24   2014 WL 1512190, at *2–3 (C.D. Cal. April 16, 2014) (holding that allegations of a negative

25   performance review, criticism, and demeaning comments related to the plaintiff's pregnancy that

26   culminated in her termination "taken together, suggest at least a possibility that [a supervisor]

27   engaged in a pattern of harassing conduct . . . based on her pregnancy" and were "sufficiently

28   severe" to plausibly allege a harassment claim).

United States District Court
Northern District of California

18

To the extent that the Secretary factually challenges the severity or pervasiveness of Ms. Young's allegations, this argument is "best evaluated in light of an evidentiary record."  *See, e.g.*, *Brown v. Contra Costa Cty.*, No. C 12-1923 PJH, 2014 WL 1347680, at *7 (N.D. Cal Apr. 3, 2014) (denying a motion to dismiss).  For the purpose of Rule 12(b)(6), Ms. Young's allegations are enough to plead a hostile work environment that "mak[es] it more difficult for [Ms. Young] to do her job, to take pride in her work, and to desire to stay on in her position."  *Steiner*, 25 F.3d at 1463.  Under the totality of the circumstances, it is plausible that a reasonable person of her racial background or age would perceive this as an intolerable working environment, particularly when "Mr. Smith publicly told stake holders and BTS staff that because of the removal of the Asian American managers . . . , OAI staff had a 'high moral,'" and when the AJ found in Ms. Young's favor on this claim on a full factual record and the OFO affirmed.  SAC ¶ 78 & Ex. 24 at 10, Ex. 27 at 4–5.[11]

Accordingly, the Secretary's motion to dismiss Ms. Young's hostile work environment claim is DENIED.

### D.   Claim III: Retaliation for Protected Activity

In her third claim, Ms. Young alleges that "stopping [her] from working on tasks in the SharePoint Project constituted reprisal for protected EEO activity."  SAC ¶ 80.  In support of this claim, Ms. Young states that Mr. Smith, her second-level supervisor, intervened after she began working on the SharePoint project in March 2009, three months after he was "informed" of her EEO complaint in December 2008, and told her supervisor, Steve Lewis, who she alleges oversaw the SharePoint project, that Ms. Young must stop working on the project.  *Id.* ¶ 81.  She states that she was made to return to what in her view was "entry-level" work.  *Id.*

Title VII prohibits retaliation against employees who initiate or participate in a proceeding

_____

[11] The Secretary argues that "some of [Ms. Young's] allegations make plain that there was only a subjective belief that a condition had created a hostile work environment," quoting the portion of her complaint reading as follows: "'For me, that was an undisguised encouragement to the hostile work environment against me.'"  Mot. at 21 (quoting SAC ¶ 78) (sic; the words "an" and "work" do not appear in the original).  To prevail, Ms. Young is required to show that she subjectively perceived the environment as hostile, *in addition to* showing an objectively hostile environment. Ms. Young's subjective perception is in no way incompatible with objective hostility.

United States District Court
Northern District of California

1   or in an investigation involving her employer's alleged violations of civil rights laws.  29 C.F.R. §

2   1614.101(b).  To succeed on a retaliation claim, a plaintiff must demonstrate that: "(1) the

3   employee engaged in a protected activity, (2) she suffered an adverse employment action, and (3)

4   there was a causal link between the protected activity and the adverse employment decision.

5   *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1093–94 (9th Cir. 2008).  The EEOC has interpreted

6   "adverse employment action" to mean "any adverse treatment that is based on a retaliatory motive

7   and is reasonably likely to deter the charging part or others from engaging in a protected activity."

8   *Ray v. Henderson*, 217 F.3d 1234, 1242–43 (9th Cir. 2000).  Although EEOC guidelines are not

9   binding on the courts, they "constitute a body of experience and informed judgment to which

10  courts and litigants may properly resort for guidance."  *Meritor Savings Bank v. Vinson*, 477 U.S.

11  57, 65 (1986) (citation and internal quotation marks omitted).

12       For Title VII purposes, only non-trivial violations constitute adverse employment actions.

13  *Brooks*, 229 F.3d at 298.  An adverse action for a retaliation claim is one that "might have

14  dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington*

15  *N. & Santa Fe Rwy. Co. v. White*, 548 U.S. 53, 68 (2006) (quotations and citations omitted).

16  Although not an exhaustive list, among those employment decisions that can constitute an adverse

17  employment action are termination, dissemination of a negative employment reference, issuance

18  of an undeserved negative performance review, and refusal to consider for promotion.  *Brooks*,

19  229 F.3d at 928.

20       Because it is often difficult for plaintiffs to adduce direct evidence of retaliation, causation

21  between protected activity and adverse employment action may be inferred from circumstantial

22  evidence, such as an employer's "pattern of antagonism following the protected conduct," *Porter*

23  *v. Cal. Dep't Corr.*, 419 F.3d 885, 895 (9th Cir. 2005), or the temporal proximity of the protected

24  activity and the occurrence of the adverse action.  *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840,

25  850 (9th Cir. 2004); *Bell v. Clackamas Cty.*, 341 F.3d 858, 865 (9th Cir. 2003).

26       Here, the Secretary moves to dismiss Ms. Young's retaliation claim, arguing that she has

27  failed to plausibly allege a Title VII protected activity, an adverse employment action, and a

28  causal connection between the alleged protected activities and adverse employment decisions.

United States District Court
Northern District of California

Mot. at 22–23.  The Court disagrees.  Certainly, Ms. Young has sufficiently alleged that she engaged in a protected activity, namely the filing of her EEO complaint in December 2008.  SAC ¶ 82; *see Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam).  The Secretary's argument to the contrary is frivolous.  *See* Mot. at 22 (asserting without explanation that Ms. Young "has not alleged a Title VII protected activity that could support her claim of retaliation under that statute").  In addition, Ms. Young has sufficiently alleged that she suffered an adverse employment action, i.e., her removal from the SharePoint project and return to her GIS "entry-level" work.  Any question of the severity of that action is better addressed on a factual record.

The somewhat closer issue is whether Ms. Young has sufficiently alleged a causal connection between the filing of the EEO complaint and her removal from the project.  The Secretary contends that the isolated instance of taking Ms. Young off of the SharePoint project does not demonstrate a "pattern of antagonism" following protected conduct.  Mot. at 23 (quoting *Porter*, 419 F.3d at 895).  The Secretary further argues that the period of three to four months of time when Mr. Smith was "informed" of the complaint and when he pulled Ms. Young off of the special project is too attenuated to infer a causal relationship.  *Id.*

Although that period of a few months is longer than most to establish temporal proximity, *Breeden*, 532 U.S. at 273 (citing Tenth Circuit decisions that held three-month and four-month intervals insufficient to infer causation, but holding in the case before the Court only that a twenty-month interval was insufficient), other factors support the plausibility of Ms. Young's claim.  For one thing, the SharePoint project appears to have been Ms. Young's first project outside of her normal GIS "entry-level" work, and thus the first opportunity after her EEO complaint for Mr. Smith to intercede and block her from performing work beyond that role where he knew she was unhappy, even though the supervisors of both the SharePoint project and the GIS office were agreeable to her assignment, and her supervisor at GIS was otherwise unable to task her sufficiently to fill her time.  *See* SAC ¶¶ 80–82.  Moreover, the AJ determined on a factual record that Mr. Smith's explanation for removing Ms. Young from the SharePoint project was not credible and that the DOT's failure to preserve evidence supported an adverse inference, and

21

1   therefore "conclude[d] that the preponderance of the evidence establishes that [Mr.] Smith's action

2   barring this assignment was in retaliation for [Ms. Young's] protected EEO activity." *Id.* Ex. 24 at

3   12.  The Court finds no basis on the pleadings to reject that conclusion as implausible.

4          Accordingly, the Secretary's motion to dismiss Ms. Young's retaliation claim is DENIED.

5   **E.    Claim IV: Constructive Retirement**

6          In her fourth claim, Ms. Young alleges that the DOT's VSIP offer targeting her demoted

7   position triggered constructive retirement in violation of Title VII and the ADEA. *Id.* ¶ 83.  In

8   particular, she alleges that because of her dissatisfaction with her job status in March 2015, she

9   accepted the VSIP offer, and that this, in her view, violated both statutes. *Id.* ¶ 89.

10         The Secretary argues this claim fails because it did not go through the administrative

11  presentment process under either statute, and thus dismissal with prejudice is warranted because

12  this defect cannot be cured.  Mot. at 10.  The Secretary also argues that even if Ms. Young

13  sufficiently exhausted administrative remedies, she has not plausibly pleaded race discrimination

14  under Title VII or age discrimination under the ADEA. *Id.*

15         **1.    Ms. Young Exhausted Administrative Remedies**

16         To bring a Title VII claim in district court, a plaintiff must first exhaust her administrative

17  remedies.  42 U.S.C. § 2000e-16(c); *Sommatino v. United States* 225 F.3d 704, 707 (9th Cir.

18  2001).  Under the statutory and regulatory scheme, a federal employee must notify an EEO

19  counselor of discriminatory conduct within forty-five days of the alleged conduct.  *Sommatino*,

20  255 F.3d at 708 (citing 29 C.F.R. §§ 1614.105, 1614.106).  If the matter is not resolved after the

21  agency issues its final decision, the employee may either: (1) file directly in federal court within

22  90 days, *id.* § 1614.407(a); or (2) appeal through the EEOC within 30 days, *id.* §§ 1614.401(a),

23  1614.402(a).  An employee who chooses further administrative relief is not later precluded from

24  filing in federal court at the conclusion of the EEOC proceedings.  *Id.* § 1614.407(c); 42 U.S.C.

25  § 2000e-16(c).  If, at any time, the employee's complaint sits idle within the administrative

26  process for more than 180 days, the employee can immediately file a civil action in federal court.

27  *See* 42 U.S.C. § 2000e-16(c); 29 C.F.R. §§ 1614.407(b), (d).

28         Under the ADEA, a federal employee seeking to pursue an age discrimination claim in

1   federal court has two options: (1) she may undertake the same administrative exhaustion process

2   outlined above; or (2) she can bypass that process and instead give notice to the EEOC of the

3   alleged discriminatory act and her intent to sue the Agency.  *See Whitman v. Mineta*, 541 F.3d

4   929, 932 (9th Cir. 2008).  If proceeding with the bypass option, the employee must provide notice

5   within 180 days of the challenged action and the EEOC must "promptly notify all persons named

6   therein as prospective defendants in the action."  29 U.S.C. § 633a(d).

7          The Supreme Court has held that Title VII's claim-processing rules, while mandatory, are

8   non-jurisdictional.  *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1851 (2019).  However, a plaintiff

9   "must allege compliance with the [mandatory processing rule] . . . in order to state a claim on

10  which relief may be granted."  *Cloud v. Brennan*, 436 F. Supp. 3d 1290, 1302 (N.D. Cal. 2020)

11  (citation omitted).  In order to meet the requirement of substantial compliance, the allegations of a

12  plaintiff's judicial complaint must be "like or reasonably related to the allegations" in

13  administrative complaint submitted to the EEOC, such that they would fall within "the scope of an

14  EEOC investigation which [could] reasonably be expected to grow out of the [administrative]

15  charge of discrimination."  *Id.* at 1302 (quoting *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir.

16  1990)); *see also Vasquez*, 349 F.3d at 644 (holding that a court may consider "all claims of

17  discrimination that fall within the scope of the EEOC's actual investigation or an EEOC

18  investigation that could reasonably be expected to grow out of the charge").

19         Courts evaluating the similarity between an administrative complaint and a judicial claim

20  "may consider 'such factors as the alleged basis of the discrimination, dates of discriminatory acts

21  specified within the charge, perpetrators of discrimination named in the charge, and any locations

22  at which discrimination is alleged to have occurred.'"  *Vasquez*, 349 F.3d at 644 (quoting *B.K.B. v.

23  Maui Police Dep't*, 276 F.3d 1091, 1100 (9th Cir. 2002)).  "In addition, the court should consider

24  plaintiff's civil claims to be reasonably related to allegations in the charge to the extent that those

25  claims are consistent with the plaintiff's original theory of the case."  *B.K.B.*, 276 F.3d at 1100.

26  "Procedural technicalities should not be employed to impede a Title VII claimant from obtaining a

27  judicial hearing on the merits."  *Ramirez v. Nat'l Distillers & Chem. Corp.*, 586 F.2d 1315, 1321

28  (9th Cir. 1978) (citation omitted).

United States District Court
Northern District of California

23

1     This Court has previously grappled with tension in Ninth Circuit precedent concerning

2    conduct occurring after an administration investigation has ended, and concluded that "even facts

3    occurring *after* the administrative agency has completed its investigation can fall within the scope

4    of an earlier administrative complaint so long as they are sufficiently similar to the claims raised

5    therein." *Williams v. Wolf*, No. 19-cv-00652-JCS, 2019 WL 6311381, at *8 (N.D. Cal. Nov. 25,

6    2019) (emphasis added); *see also id.* at *7 ("*Vasquez*, which was not an en banc decision, cannot

7    overrule *Sosa's* holding that even subsequent incidents that the 'EEOC could not have

8    investigated' can be sufficiently related to an earlier administrative complaint to satisfy the

9    exhaustion requirement.").  In that case, the plaintiff sued her employer for discrimination and

10   retaliation in the course of her employment as a paralegal. *Id.* at *1.  The employer sought

11   dismissal of claims based on an allegation that the plaintiff's supervisor notified her in June 2019

12   that she was being investigated for neglecting her duties and failing to follow instructions, arguing

13   that "none of the agency's EEO investigations could have encompassed this claim because it had

14   not yet occurred by the conclusion of each investigation." *Id.*  This Court rejected that argument,

15   finding that the plaintiff's 2017 and 2018 administrative complaints alleged that the same

16   supervisor previously subjected her to a series of purported adverse actions, including similar

17   criticism of her job performance. *Id.* at *8.  Although the 2019 allegation regarding job

18   performance was not separately exhausted, this Court denied dismissal of it because the claim was

19   "consistent with the plaintiff's original theory of the case." *Id.* (quoting *B.K.B.*, 276 F.3d at 1100).

20     Similarly, here, Ms. Young's constructive retirement allegations are consistent with her

21   original theory of the case because they involve the same actors and similar conduct.  Ms. Young

22   alleges that as a result of actions addressed in her other claims, she was "demoted" and placed into

23   a position where she was underutilized, thus making the GIS position a target for the DOT's VSIP

24   program, which she characterizes as "the last straw that made the hostile work environment

25   intolerable." *See* SAC ¶¶ 83–84.

26     Perhaps more significantly, though, administrative proceedings had not ended when Young

27   accepted the VSIP retirement offer, and the parties litigated before the EEOC whether accepting

28   that offer barred her claims.  In its petition for clarification, the DOT argued that, despite Ms.

Young having prevailed before the AJ and on appeal to the OFO, she was not entitled to relief because she accepted the VSIP offer while her appeal was pending.  *Id.* Ex. 31.  In rejecting that challenge, the OFO acknowledged Ms. Young's position that there was "a direct link between the discrimination and her decision to retire in 2015," and that the DOT failed to raise the argument in its request for reconsideration, which it filed after Ms. Young accepted the VSIP offer.  *Id.* Ex. 32 at 4.  Ms. Young's efforts to pursue reinstatement after accepting the VSIP offer (and her agreement to return the incentive payment if reinstated) tend to suggest that she would not have retired but for her reassignment, and the basic theory of constructive discharge—that Ms. Young's retirement was "directly linked" to the alleged discrimination—was specifically addressed by the EEOC.  *See id.*  Accordingly, this theory satisfies the administrative exhaustion requirement not only in that it "could reasonably be expected to grow out of the [original administrative] charge," but also in that it fell "within the scope of the EEOC's actual investigation."  *See Vasquez*, 349 F.3d at 644.

Accordingly, the Secretary's motion to dismiss for failure to exhaust administrative remedies is DENIED.

### 2.    Ms. Young Sufficiently Alleges Constructive Discharge

A plaintiff who chose to leave a job may nevertheless pursue a Title VII or ADEA claim based on a theory of constructive discharge.

> "A constructive discharge occurs when a person quits his job under circumstances in which a *reasonable person* would feel that the conditions of employment have become intolerable." *Draper* [*v. Coeur Rochester, Inc.*, 147 F.3d 1104, 110 (9th Cir. 1998)] (emphasis added). Thus, an employee need not demonstrate that his employer intended to force him to resign, but merely that his conditions of employment were objectively intolerable. *Id.*

*Lawson v. Washington*, 296 F.3d 799, 805 (9th Cir. 2002) (addressing Title VII); *see Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (addressing the ADEA).  The Ninth Circuit has "set the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable."  *Poland*, 494 F.3d at 1184.

25

1   Whether Ms. Young will be able to meet that high bar on the facts is not yet before the

2   Court, but applying a liberal pleading standard, her allegations render the claim plausible.  As

3   discussed above, Ms. Young has sufficiently alleged that she suffered discrimination, harassment,

4   and retaliation in violation of Title VII and the ADEA.  She alleges that she was transferred to a

5   position she was unsuited to perform[12] and blocked from performing tasks that fell within her

6   skillset, including in the years following her initiation of administrative proceedings.  *See, e.g.*,

7   SAC ¶ 85 (discussing incidents occurring in 2011).  She further alleges that despite her successful

8   administrative claim and the AJ's order in 2014 to reinstate her to either her original position "or

9   its current organizational equivalent," the DOT declined to do so.  *See* SAC ¶¶ 86–88 & Ex. 24 at

10   17.  The discriminatory and retaliatory animus that Ms. Young has plausibly alleged in the context

11   of her other claims also applies equally to the theory that her alleged mistreatment drove her to

12   accept the VSIP offer.

13   Accordingly, the Court finds these allegations sufficient to proceed beyond the pleadings,

14   and DENIES the Secretary's motion to dismiss this claim.

15   ### F.   Claim V: Non-Selection in 2016 and 2017

16   In her fifth and final claim, Ms. Young asserts new violations of Title VII and the ADEA.

17   *Id.* ¶ 90.  Specifically, she claims that her non-selection for a position offered to her in 2016,

18   which became vacant again in 2017, and the placement of younger and less experienced

19   employees in that position each time, violated both statutes.  *Id.* ¶¶ 91–94.

20   The Secretary makes the same argument as above in the context of constructive

21   discharge: that this claim did not go through the administrative presentment process under either

22   Title VII or the ADEA, and that even if this claim is properly before this Court, Ms. Young has

23

24   [12] While the Ninth Circuit held in *Poland* that "constructive discharge cannot be based upon the employee's subjective preference for one position over another," that case was decided on a
25   factual record after a bench trial, and the Ninth Circuit concluded that the particular demands placed on the employee were "nothing extraordinary" in the specific context of his job as a
26   Customs Service special agent, and "would not cause a reasonable agent in Poland's shoes to feel compelled to quit." *Poland*, 494 F.3d at 1185 (citation and internal quotation marks omitted).  At the early stage of this case, based solely on the pleadings, the Court cannot say that a reasonable
27   IT specialist in Ms. Young's position would tolerate the alleged harassment, discrimination, and reassignment to unsuitable work.  The Court further notes that *Poland* acknowledged that the lack
28   of any decrease in salary or benefits is "not a dispositive factor."  *Id.*

United States District Court
Northern District of California

1  not plausibly alleged discrimination under either statute.  Mot. at 10.

2         The Court concludes that Ms. Young has sufficiently exhausted administrative remedies

3  for much the same reason discussed above in the context of her constructive discharge claim.  The

4  DOT's alleged failure to place Ms. Young in the role that the OFO ordered it to provide her—

5  instead selecting a younger employee for that role, and again after the first such employee was

6  reassigned—would naturally fall within the scope of the ongoing administrative proceedings at

7  that time, particularly after Ms. Young filed her petition for enforcement raising issues of the

8  DOT's compliance.  *See* SAC Ex. 32 at 4 (February 1, 2017 order on the DOT's petition for

9  clarification, requiring the DOT to "restore [Ms. Young] to her position in [OAI], *or the*

10 *equivalent position it offered to her on March 10, 2016*, which she accepted" (emphasis added));

11 *see generally id.* Ex. 41 (corrected order on petition for enforcement).

12        The Court also concludes that Ms. Young has plausibly alleged an ADEA violation, in that

13 she was denied a position that she alleges she was qualified to perform (an inference supported by

14 the allegation that the DOT initially offered it to her), that she alleges was materially superior to

15 the alternative position the DOT later offered her,[13] and that she alleges was instead filled instead

16 by less qualified younger employees.  The Court therefore DENIES the Secretary's motion to

17 dismiss this claim to the extent it implicates the ADEA.

18        With respect to Title VII, however, Ms. Young has not alleged that the employees selected

19 for the role at issue were non-Asian.  The Court therefore cannot reasonably infer, based on the

20 current allegations, that Ms. Young was denied the role on account of her race, even if the Court

21 infers that Mr. Smith or others at DOT harbored racial animus against Ms. Young.  To the extent

22 that this claim is based on Title VII, the Secretary's motion is GRANTED, and the claim is

23 DISMISSED with leave to amend.

24 **IV.    CONCLUSION**

25        For the reasons discussed above, the Secretary's motion is DENIED, except as to Ms.

26 Young's claim for race discrimination under Title VII with respect to the DOT's failure to place

27 _____

28 [13] Whether the difference in these roles was sufficient to rise to the level of an adverse
employment action is an issue better addressed on a factual record.

her in the OAI role it instead given to Robert Nazareth and then to Niranjan Miryala.  The Secretary's motion is GRANTED as to that claim, which is DISMISSED with leave to amend.  If Ms. Young wishes to pursue that claim, she may file a third amended complaint no later than April 9, 2021.

Any such amended complaint must include the caption and civil case number used in this order and the words THIRD AMENDED COMPLAINT on the first page.  Because an amended complaint completely replaces the previous complaint, any further amended complaint may not incorporate claims or allegations of Ms. Young's current complaint by reference, but instead must include all of the facts and claims Ms. Young wishes to present.  *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992).

Ms. Young, who is not represented by counsel, is encouraged to contact the Federal Pro Bono Project's Pro Se Help Desk for assistance as she continues to pursue this case.  Lawyers at the Help Desk can provide basic assistance to parties representing themselves but cannot provide legal representation.  Although in-person appointments are not currently available due to the COVID-19 public health emergency, Ms. Young may contact the Help Desk at (415) 782-8982 or FedPro@sfbar.org to schedule a telephonic appointment

**IT IS SO ORDERED.**

Dated: March 16, 2021

_____
JOSEPH C. SPERO
Chief Magistrate Judge