1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7
CHERYL YOUNG,

Case No.  19-cv-01411-JCS

8
             Plaintiff,

9
      v.

**ORDER GRANTING SECOND MOTION FOR SUMMARY JUDGMENT**

10
PETE BUTTIGIEG,

Re: Dkt. No. 118

11
            Defendant.

12
## I.      INTRODUCTION

13
      Plaintiff Cheryl Young, pro se, brings this action regarding her previous employment with

14
the Department of Transportation ("DOT").  Much of the case thus far has dealt with claims for de

15
novo review of administrative proceedings that resolved in Young's favor but did not result in her

16
obtaining a satisfactory position for reinstatement.  The parties have now agreed to dismiss those

17
claims.  Defendant Pete Buttigieg, the Secretary of Transportation (the "Secretary"), moves for

18
summary judgment on Young's remaining claims for constructive discharge and non-selection.

19
The Court held a hearing on December 16, 2022.  For the reasons discussed below, the Secretary's

20
motion is GRANTED, and Young's motion for leave to file a surreply is DENIED.[1]

21
## II.     BACKGROUND

22
###     A.   Procedural History

23
      The procedural history of this case is complex and largely not relevant to the outcome of

24
the present motion.  In brief, Young prevailed on administrative claims of discrimination, and the

25
Equal Employment Opportunity Commission ("EEOC") ordered the DOT to reinstate her to an

26
equivalent position and provide back pay.  The DOT offered her a position in 2016 that she

27

28
[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

United States District Court
Northern District of California

1    accepted, but the DOT effectively revoked that offer while seeking further clarification from the

2    EEOC.  In 2017, the DOT again offered Young a position, but Young did not agree that it was

3    equivalent to her previous job and she filed a petition for enforcement.  The EEOC granted that

4    petition in part, finding some fault with the DOT's documentation and payment of back pay, but

5    concluding that the position the DOT offered Young was sufficiently similar to her past position to

6    be equivalent, and that Young was only entitled to back pay through March 17, 2017, when she

7    "effectively rejected said offer."  2nd Am. Compl. ("SAC," dkt. 44) Ex. 40 at 8.[2]

8           Young filed this action pro se, seeking to enforce the EEOC's decision as she understood

9    it, which would require either offering a different position for reinstatement or providing front pay

10   if no such position was available.  *See* Compl. (dkt. 1).  The Court dismissed her complaint as

11   untimely, and the Ninth Circuit affirmed the decision to dismiss the claim Young actually asserted

12   (which sought to enforce the EEOC's final order) because the DOT had complied with that order,

13   relying on *Carver v. Holder*, 606 F.3d 690 (9th Cir. 2010), which held that a plaintiff who

14   prevailed on liability in administrative proceedings but was unsatisfied with the EEOC's decision

15   on a petition for enforcement (where, as here, the EEOC concluded that the defendant agency had

16   complied with its previous order and no further action was necessary) could not "parse his action

17   to increase the remedy without relitigating the liability issue in pursuing his claim in federal

18   court." *Carver*, 606 F.3d at 692; *see generally Young v. Chao*,[3] 816 F. App'x 154 (9th Cir. 2020).

19   The Ninth Circuit reversed the denial of leave to amend, however, holding that Young should be

20   permitted to amend her complaint to pursue de novo review of the EEOC's decision.  *Young*, 816

21   F. App'x at 154–55.

22          Young filed an amended complaint asserting claims for de novo review under Title VII and

23   the Age Discrimination in Employment Act ("ADEA"), and the Court denied in large part the

24   Secretary's motion to dismiss.  Order re Mot. to Dismiss SAC (dkt. 56).[4]  With respect to the

25   _____

26   [2] Both parties' briefs on the present motion rely on exhibits to Young's second amended
     complaint, the authenticity of which generally do not appear to be in dispute.  *See, e.g.*, Mot. at 4.
27   [3] While this case has been pending, Pete Buttigieg replaced Elaine Chao as Secretary of
     Transportation, and thus was automatically substituted as the defendant.
28   [4] *Young v. Buttigieg*, No. 19-cv-01411-JCS, 2021 WL 981305 (N.D. Cal. Mar. 16, 2021).
     Citations herein to this Court's previous orders in this case refer to page numbers of the versions

United States District Court
Northern District of California

claims that currently remain at issue, the Court held that Young's constructive discharge and non-selection claims were sufficiently related to the administrative proceedings she initiated to satisfy the exhaustion requirements of Title VII and the ADEA, even though her retirement and alleged non-selection occurred after the initial phases of those proceedings were complete. *Id.* at 22–25, 27. The Court also held that, "applying a liberal pleading standard," Young plausibly alleged that the discriminatory animus she experienced and her assignment to an unsuitable job rendered her working experience sufficiently intolerable to support a constructive discharge claim. *Id.* at 25–26 & n.12. As for non-selection, the Court held that Young's allegations that younger employees were selected over her for positions in 2016 and 2017 were sufficient to support a claim under the ADEA, but the Court dismissed Young's Title VII non-selection claim (asserting racial discrimination) because Young did not allege that the employees who were chosen were non-Asian. *Id.* at 26–27. Young did not file a third amended complaint to reassert her Title VII non-selection claim.

The Secretary then moved for summary judgment or again to dismiss, raising arguments regarding timeliness that the Court rejected, *see* Order Denying 1st Mot. for Summ. J. ("1st MSJ Order," dkt. 79)[5] at 6–12, as well as an argument that Young could not proceed without returning the back pay that she received pursuant to the EEOC's decision. The Court held that Young need not return funds as a condition of pursuing her claims, *id.* at 12–18, and that any question of whether funds should be secured pending judgment was premature in the absence of any counterclaim by the Secretary, *id.* at 18–20, but set a schedule for the Secretary to file counterclaims and for Young to challenge them, *id.* at 20.

The Secretary filed counterclaims seeking the return of funds previously awarded to Young, dkt. 83, and on May 10, 2022, the Court denied Young's motion to dismiss the Secretary's counterclaims, Order Denying Mot. to Dismiss Counterclaims (dkt. 90).[6] The parties thereafter reached a stipulation to dismiss Young's first three claims (seeking de novo review of

---

filed in the Court's ECF docket.
[5] *Young v. Buttigieg*, No. 19-cv-01411-JCS, 2022 WL 220849 (N.D. Cal. Jan. 25, 2022).
[6] *Young v. Buttigieg*, No. 19-cv-01411-JCS, 2022 WL 1471416 (N.D. Cal. May 10, 2022).

administrative proceedings) and all of the Secretary's counterclaims.  Dkts. 108, 109.

The remaining claims are for constructive discharge based on race and age in violation of Title VII and the ADEA, and for failure to select Young for an open position based on age in violation of the ADEA.

### B.    Factual Overview

This summary is intended as a general overview, construing the evidence in a light favorable to Young.  It is not a complete recitation of the evidentiary record.

### 1.    Young's Work for the DOT and 2015 Retirement

Young is an Asian American woman who is now in her seventies.  She began working for the DOT in the Bureau of Transportation Statistics ("BTS") as a GS-14 Computer Specialist in 2001.  Schwartz Decl. (dkt. 119) ¶ 2.  She was promoted to the role of GS-15 IT Specialist in 2004.  *Id.* ¶ 3.  BTS is an agency responsible for maintaining data on the U.S. transportation system, and includes the Office of Airline Information ("OAI"), where Young worked in 2008. *See* Schmitt Decl. (dkt. 120) ¶ 3.  Young played a key role in designing and implementing a database called TranStats, managed that database and associated projects, including e-filing capabilities for airline data, and participated in modernization efforts and server transfers.  Opp'n at 2.[7]

In September of 2008, Young was reassigned from OAI to another BTS office, Geospatial Intelligence Systems ("GIS").  *See* Mehta Decl. (dkt. 121) Ex. F at 2.  Young alleged—and eventually prevailed before the EEOC in showing—that her supervisor at OAI discriminated against her based on race and age and retaliated against her for protected activity.  Mehta Decl. Ex. F at 3.

While her administrative charges were pending, Young was dissatisfied with her position

---

[7] Young failed to submit a declaration setting forth facts she herself would testify to at trial, instead presenting such information as factual assertions without citation to evidence in her opposition brief.  "[A] party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda."  *S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982).  The Court nevertheless assumes for the sake of argument that Young would be able to able to testify to the facts she asserts in her brief that reflect her own personal knowledge.

United States District Court
Northern District of California

United States District Court
Northern District of California

at GIS, where she felt that she was largely limited to entry-level work and unable to make meaningful contributions or use the skills she had developed in her position at OAI.  *See* Opp'n at 4.  The administrative judge who reviewed Young's discrimination charge found that she did not have work in 2009 commensurate with her grade level, and that then-BTS Deputy Director Steven Smith blocked her from performing more appropriate work for her former supervisor at OAI even though her new supervisor at GIS had agreed to let her do that work with her old team.  SAC Ex. 24 at 12.  In early 2011, she made multiple requests to move back to OAI.  Opp'n Exs. 11, 12.[8] Those requests were denied, and Young was encouraged to "look at opportunities to demonstrate [her] capabilities in [her] current role."  *Id.* Ex. 12.  At a deposition in March of 2011, her then-supervisor Stephen Lewis stated that Young had been given high-level, grade-appropriate work beginning in 2010 pertaining to a particular database, but that her primary work with that database only occupied one day per week.  SAC Ex. 16 (Lewis Dep.) at 35:17–36:17.

In a December 2009 affidavit, Young stated that the new administration of RITA (at the time, the larger organizational unit of the DOT in which BTS was situated) was "good" and that she was "not sure whether they should be responsible for the actions of the previous administration."  Mehta Decl. Ex. A ¶ 8.  Cheryl McQueary, who was RITA's deputy administrator and had a role in Young's transfer, left the DOT in early 2009.  Mehta Decl. Ex. B at DOT000542.  Steven Smith, who was also implicated in Young's discrimination charge, initially remained her second-level supervisor after her transfer to GIS, *see* Mehta Decl. Ex. A ¶ 2, but Smith was replaced as BTS Deputy Director by Rolf Schmitt in 2012.  Schmitt Decl. ¶ 2.  There is no indication that anyone else meaningfully tied to Young's initial allegations of discrimination remained in a relevant position to affect her work after that date.  In 2014, Young nominated Schmitt and BTS Director Patricia Hu for a merit award, describing them as supportive and respectful.  Mehta Decl. Ex. C.  She concedes in her opposition brief that Lewis, who was her supervisor at GIS and the director of that team, "was a fair supervisor" who refused to aid

---

[8] Young included a number of exhibits with her opposition brief without a declaration to authenticate and explain them.  After the Secretary filed his reply, Young filed a declaration attaching the same exhibits.  Dkt. 127.  The Court excuses Young's failure to file that declaration in conjunction with her opposition.

discrimination and tried to help her.  Opp'n at 16.

Starting in 2011, most of Young's work was for BTS's National Transportation Library ("NTL"), under the supervision of NTL's director Amanda Wilson, outside of Young's official assignment to the GIS team.  SAC Ex. 23 at 518:17–519:14 (testimony by Lewis at an administrative hearing); Opp'n at 6; *see* Schmitt Decl. ¶ 4.  Although Young was not formally assigned to NTL, Wilson authored portions of her 2013–2014 performance review, which was generally positive.  Opp'n at 6 & Ex. 13; Schmitt Decl. ¶ 4.  Asked at her deposition to describe her working relationship with Wilson, Young testified that "Ms. Wilson is a very nice person," although she did not describe this period of her employment positively, stating that she did not know who her second-level supervisor was at the time and she "felt very lonely."  Mehta Decl. Ex. E (Young Dep.) at 35:9–17.

In 2014, Young requested a formal transfer to NTL because she "wanted to work with Amanda [Williams] in big data."  *Id.* at 31:25–32:6; *see* Opp'n at 6–7 & Exs. 14, 15; Schmitt Decl. ¶ 5 & Ex. 1.  Schmitt did not respond to an email Young sent him on that subject in October of 2014, where Young also stated that she did not know who her supervisor would be going forward if she remained at GIS because Stephen Lewis had been promoted.  Opp'n at 6 & Ex. 14.  Young sent Wilson an email requesting a transfer to NTL in December of 2014.  Schmitt Decl. Ex. E.  Wilson forwarded that email to Schmitt in in February of 2015, stating that she would work towards completing the transfer if Schmitt had no objection.  Schmitt Decl. Ex. 1.  Schmitt responded by directing Wilson to work with the human resources department to implement the transfer.  Schmitt Decl. ¶ 5 & Ex. 1.  Young did not learn that Schmitt had approved her request until after she accepted an early retirement offer, as discussed below.  Opp'n at 7.

Beginning in 2014, BTS's leadership—Schmitt and Hu—were developing plans to offer voluntary separation incentive payment ("VSIP") to BTS staff in order to reduce costs as part of a DOT reorganization transferring the functions of the larger organization in which BTS was then situated, RITA, to the Office of the Assistant Secretary for Research and Technology ("OST-R").  Schmitt Decl. ¶ 6.  They decided to extend VSIP offers to all BTS employees at grade GS-14 (none of whom had supervisory positions) and all non-supervisory BTS employees at grade GS-

15. *Id.* Young's GS-15 position was non-supervisory at all relevant times. Mehta Decl. Ex. E (Young Dep.) at 34:24–35:3. According to Schmitt, Young would have received a VSIP offer even if she had remained in her previous role at OAI and had never been transferred to GIS. Schmitt Decl. ¶ 8.

A DOT human resources officer, Susan Schwartz, sent Young a memorandum on February 24, 2015 stating that her "position has been identified as one that is authorized to receive this VERA/VSIP offer," and enclosing an application for her to complete by March 25, 2015 if she wished to accept the offer to retire effective March 31, 2015. Opp'n Ex. 6; Schwartz Decl. ¶ 9 & Ex. 10. The memorandum explained that employees accepting the offer for separation pay would receive the lesser of $25,000 or their entitlement to severance pay under a formula based on service tenure and age. Opp'n Ex. 6. A DOT fact sheet explained that although the department was "not considering a reduction-in-force," employees who did not accept VSIP offers might not stay in their current positions, noting that offers had been "made to incumbents in positions that don't align well with the long-term most effective organizational structure." SAC Ex. 26 at 2.

Young discussed the VSIP offer with her husband. Mehta Decl. Ex. E (Young Dep.) at 57:18–21. On March 2, 2015, she asked Schwartz about health insurance after retirement and what would happen to her accrued roll-over hours and sick leave. Schwartz Decl. ¶ 10 & Ex. 11. On March 19, 2015, Young submitted a VSIP application, which included an acknowledgment that her decision was "entirely voluntary and has not been coerced." Schwartz Decl. ¶ 12 & Ex. 12. Schwartz notified Young on March 23, 2015 that her application was approved, and Young retired on March 31, 2015 and received a $25,000 incentive payment. *Id.* ¶¶ 12–13 & Ex. 13.

At her deposition, Young testified that her decision was based on considerations including: (1) Lewis had been promoted away from the GIS team and Young was not sure if his replacement would be as supportive of her; (2) she had not heard back about her request to transfer to NTL; (3) she was demoralized and humiliated by VSIP letter's implication that she was not valuable to the DOT and could be replaced by a more junior employee through restructuring; (4) after her difficult and humiliating new beginning at GIS where she did not understand the job, she was not willing to risk an involuntary reassignment to another new position that she would be unable to

1   perform effectively; and (5) she had already received a favorable decision from an administrative

2   judge that was on appeal by the DOT to the EEOC, and Young believed that if she ultimately

3   prevailed in obtaining reinstatement to a position she preferred, she could return the incentive

4   payment and return to work.  Mehta Decl. Ex. E (Young Dep.) at 72:11–76:13.

5           Young sent the following email to Hu and Schmitt on March 19, 2015, the same day she

6   submitted her VSIP application:

7                   Dear Pat and Rolf,

8                   I decide to take the VSIP and get retired.

9                   I am lucky that I have got the best bosses in my final employment
                    years. I am sad that I cannot do the things I wanted to do anymore. I
10                  have been thinking for days after the VSIP announcement. It is a
                    difficult decision.

11

12                  Sometimes, good things do happen too late. I feel sad. I wish I could
                    be younger. I wish I had met you in 2008. I imagined how it would
13                  like if you came to BTS 7 years earlier … I am sorry that I could not
                    do more.

14                  I will miss you. Under your leadership, BTS has been very different
                    in the past years. BTS has never been so united, people have never
15                  been so motivated and willing to contribute. I know that BTS will
                    move forward and achieve a lot more under you. I hope to hear a lot
16                  of good news about BTS in the future….

17                  My last sincere wish for you is that: "Please do not work too hard."
                    Your health is very important to the employees in BTS, and to the
18                  American people. Please take care of yourself.

19                  Sincerely,
                    Cheryl
20

21   Schmitt Decl. Ex. 4 (ellipses in original).  In a subsequent email, Young invited Hu, Schmitt, and

22   Williams (her de facto direct supervisor at NTL) to her home for lunch after her retirement.  *Id.*

23           On April 1, 2015, the day after her retirement was effective, Young sent the following

24   email to several DOT human resources supervisors, praising an employee who helped her navigate

25   the VSIP process:

26                  Dear DOT HR supervisors,

27                  One [sic] the first day of my retirement, I would like to comment on
                    Senia Tucker's great service.
28

8

> Retirement is a big decision for everybody. I have been expecting for retirement especially, I have been waiting for the VSIP, but when VSIP really came, I hesitated. I just am too used to employment life. All I needed to do was to take care of my work. The rest would be taken care of by the employer. I was a little scared to think that I will face it all by myself now. Thanks to Senia that has helped me to walk through the complicate [sic] retirement process and answered all my questions so patient and nice. She encouraged me and told me that I still have an employee - OPM. She gave me all the information I need, fill up the forms as much as she could, explained all the items I was not so sure. It is very nice that someone who is so reliable and caring was always by my side to get the [final] important thing done!
>
> Now that I have started my retirement, life is so good. I am happy that I made the right decision. Looking back, I am proud of what I have achieved. Looking forward, I see my grannies' smiling faces waiting for me in SF. Many, many thanks to Senia to help me get everything done smoothly. Please bring my sincere thanks to her.
>
> Thank you!
> Cheryl

Schwartz Decl. Ex. 14.

Young testified at her deposition that she moved from Virginia to California in 2015 or 2016 for reasons including poor health and depression, to be closer to her daughter who could help care for her.  Mehta Decl. Ex. E (Young Dep.) at 17:4–18.  She bought her house in South San Francisco before 2015.  *Id.* at 17:24–18:7.

### 2.     Administrative Proceedings

At the time of Young's retirement, administrative proceedings related to her charges of discrimination and retaliation were ongoing.  An administrative judge determined on February 5, 2014 that Young had experienced retaliation for protected activity and discrimination on account of race and age in the events leading up to and surrounding her 2008 transfer to GIS.  *See* Mehta Decl. Ex. F at 2–3 (subsequent EEOC order summarizing prior proceedings).  The DOT issued a final order declining to comply with the administrative judge's determination and filed an appeal to the EEOC.  *See id.* at 3.  The EEOC affirmed the administrative judge's conclusions and remedies on September 16, 2015 (several months after Young accepted the VSIP offer), and denied the DOT's request for reconsideration on February 23, 2016.  *Id.* at 3–4.  In the denial of reconsideration, the EEOC ordered that the DOT must, within 30 days of the order becoming final, "offer to restore [Young] to her position in [OAI] (or its current organizational equivalent)

9

retroactive to September 9, 2008," among other relief including compensatory damages and attorneys' fees. *Id.* at 4–5.

To comply with that order, Schwartz (the human resources officer) provided Young with an offer letter on March 10, 2016. Schwartz Decl. ¶ 15 & Ex. 15. The letter did not include a detailed description of the role being offered, stating only that it was a "position of IT Specialist (SYSANALYSIS), GS-2210-15 step 9" in OAI, working out of Washington, DC. *Id.* Ex. 15. The letter instructed Young to "respond with [her] decision to this offer of employment within two (2) weeks" of when she received it. *Id.*

According to Schmitt, "there had been significant changes to the IT environment in OAI" since Young last worked there in 2008, including technical changes, centralization of some DOT IT functions, and more reliance on contractors, such that "OAI's staff had reduced by approximately half." Schmitt Decl. ¶ 11. He states that OAI no longer hired non-supervisory GS-15 employees, but that BTS reserved such a position for Young to comply with the EEOC's order. *Id.* ¶ 12.

Young accepted the March 2016 offer. *See* Mot. (dkt. 118) at 9; Opp'n at 11; SAC Ex. 30. After a conversation with Assistant Secretary Greg Winfree, she anticipated "working on a system like what has been implemented as TranStats E-Filing that not only collects data, but also processes data, monitors data quality, monitors the data filing status, and disseminates data," with automated data quality and filing status reports. SAC Ex. 30.

After some further communications between Young and the DOT, Paul Sanchez—an attorney in the DOT's Office of the General Counsel—emailed Young on March 29, 2016, writing that he "thought HR was going to call [her] today, but now they are not," because an EEOC compliance officer had granted Sanchez authority "to submit a Petition for Clarification regarding the Order." Answer to Counterclaims (dkt. 98-10) Ex. 10.[9] According to Sanchez, the DOT had "questions about the implementation of the Order" and needed "further advice" before moving

---

[9] Exhibits to an answer to counterclaims (which have since been dismissed) are at best an unorthodox source of evidence for a motion for summary judgment, but the Secretary has not objected to this email cited in Young's opposition brief, and the Court assumes for the purpose of the present motion that Young could introduce this evidence in an admissible form at trial.

1    forward. *Id.*  Schwartz elaborates on this in her declaration:

2        DOT faced challenges in implementing Plaintiff's reinstatement upon
         her acceptance in light of her status as a retiree. We consulted with
3        OPM on how to process Plaintiff's reinstatement and learned we
         would need to unwind her voluntary retirement—including by
4        returning to OPM her incentive payment and annuity payments—and
         reinstate her as of that prior date. We paused that process to seek
5        clarification from the OFO on whether that was required by its order.

6    Schwartz Decl. ¶ 16.  According to Schmitt, the GS-15 position that had been created for Young

7    "was not filled by someone else," but instead "reserve[d] . . . for the purpose of rehiring [Young]

8    in case that was deemed necessary."  Schmitt Decl. ¶ 13.

9            On April 12, 2016, Sanchez submitted on behalf of the DOT a petition for clarification, in

10   the form of a short memorandum, to EEOC Compliance Officer Rodney Jenkins.  SAC Ex. 31.

11   Sanchez wrote that the DOT had determined that compliance with the previous order would

12   require reinstating Young effective to the date she retired in 2015, providing her back pay for her

13   salary and benefits since that date, and collecting from Young "the $25,000 VSIP she voluntarily

14   accepted as well as the retirement benefits she received."  *Id.* at 2 & nn.5–6.  In Sanchez's view,

15   Young retired voluntarily, and the relief at issue would only be appropriate if Young's retirement

16   was involuntarily.  *Id.* at 2.  Sanchez had found no "cases where a complainant retired *while her*

17   *case was on appeal*, and where a determination was then made to reinstate the complainant

18   without an assessment of the circumstances under which her retirement occurred."  *Id.*  The DOT

19   therefore sought "clarification whether the Order issued on February 26, 2016 requires the Agency

20   to restore [Young] to her prior position in view of her voluntary retirement."  *Id.*  After Sanchez

21   submitted the petition, DOT human resources stopped talking to Young.  Opp'n at 11.

22           In a decision issued February 1, 2017, the EEOC noted that "petitions for clarification

23   cannot change the result of a prior decision or diminish the relief ordered," and that the DOT had

24   "already begin the process of fully complying . . . when it offered [Young] an equivalent position

25   on March 10, 2016," but that the DOT had failed to follow up with Young after she accepted that

26   position.  Mehta Decl. Ex. G at 3.  Without specifically addressing Young's retirement as having

27   any bearing on that issue, the EEOC therefore determined that the DOT "should immediately take

28   appropriate action to return [Young] to work."  *Id.*  Addressing the question of back pay in

United States District Court
Northern District of California

11

United States District Court
Northern District of California

somewhat more detail, the EEOC noted that Young had been in an unsuitable position for "nearly seven years" as a result of the discriminatory transfer before retiring, and that the DOT failed to raise the issue of her retirement in its request for reconsideration, which it filed two months after she retired.  *Id.* at 3–4.  The EEOC therefore determined that Young was entitled to back pay beyond the date of her retirement, and ordered the DOT to restore Young to "her position in [OAI], or the equivalent position it offered to her on March 10, 2016, which she accepted," within thirty days.  *Id.* at 4.

On March 3, 2017, Schwartz sent Young a letter confirming her employment as an "Information Technology Specialist (System Analysis), GS-2210-15 step 10" in OAI— substantially the same job title as the 2016 position that Young had accepted but never received, rated one step higher presumably to reflect the additional year of retroactive service that had accrued since the previous offer.  Schwartz Decl. ¶ 17 & Ex. 16.  The letter stated that Young must complete security forms before beginning work.  *Id.* Ex. 16.  Around this time, Young was added to the OAI roster and William Chadwick, who had been the director of OAI since 2012, was informed that she was joining the team.  Opp'n Ex. 30 (Chadwick Dep.) at 26:3–14, *see id.* at 23:9–15 (framing the discussion as related to the period surrounding a March 2017 meeting).

Young inquired about the job duties, and Schwartz sent a description for the role of TranStats Manager, with responsibility to "guide[] the operation, maintenance, and enhancement of TranStats, which is the information system that facilities public access to data from [OAI]," and to "develop[] and implement[] plans to integrate TranStats with other technologies deployed on the BTS website."  Mehta Decl. Ex. H at 3–4 (subsequent EEOC enforcement decision, quoting Schwartz's response).

After Young took issue with the initial job description, Schwartz sent her the following revised description on March 9, 2017, which she had received from Schmitt after forwarding Young's inquiry:

> Both "E-filing" system and IAIS have been replaced, and parts of OAI data processing formerly done in Oracle will be completely replaced by Sybase this year. The OAI system as of April 2017 will have three basic components:

1.  "eSubmit" is a .NET program that feeds electronic data submissions from airlines into Sybase.
2.  Transtats is the Sybase database that houses all OAI data.
3.  The Transtats web interface generates Sybase queries to create HTML tables for users of the website.

To replicate Cheryl Young's position as TranStats Database Manager within the new OAI data processing systems, we propose that she be the Sybase database administrator responsible for assuring that data from eSubmit are properly added to Sybase and that queries generated by the web front end are properly executed in Sybase. She would not need to know the technology such as Tableau for generating Sybase queries, but would be responsible for assuring that Sybase produces the HTML tables requested by those queries accurately.

Schwartz Decl. Ex. 17.

Schmitt states in his declaration that he envisioned Young "would have overseen TranStats, which contains the Sybase database housing all OAI data, to maintain the data flow and query tools," and "[s]ince much of the work had shifted to contractors by this time, [she] also would have been responsible for managing those contractors." Schmitt Decl. ¶ 14. It is not clear whether Schmitt's intent that Young would manage contractors was communicated to Young at that time; it is not recounted in the EEOC's enforcement decision. *See* Mehta Decl. Ex. H.

On March 13, 2017, Young sent an email to Schwartz stating that the position offered in 2017 was not equivalent either to her 2008 position as a contracting officer's technical representative ("COTR") and database manager with responsibilities including the E-Filing system, or to the position offered in 2016, which Young had understood to include E-Filing responsibilities and COTR functions. Opp'n Ex. 31 at DT002456–57. She stated that if her previous responsibilities had been reassigned to the point that she could not be reinstated to them, she should receive front pay. *Id.* at DT002457. After being forwarded that email, Schmitt responded to other DOT employees that "[w]e should discuss front pay," and later wrote:

I am trying to reconstruct her job as best I can given the current IT environment. She is basically asking to be in charge of eSubmit as well as Sybase and have COTR responsibility (which would cover all OAI contracts which are not separated by system as in the past). She is effectively asking to be in charge of all OAI IT. That would require Pat[ricia Hu]'s approval enshrined [sic] she returns from international travel next week.

*Id.* at DT002455–56.

On March 17, 2017, Young sent an email to Paul Sanchez, the DOT attorney, stating that

she did "not agree that the Sybase database administrator position is the 'replicate' of [her] prior position or its equivalent," and noting that before she was reassigned, she was a COTR and database manager, while the "database administrators" were non-managerial contractors.  SAC Ex. 36 at 1.  She stated that she "just found out that OAI has started an Airline Performance and Economical Information System project (APEIS) that should closely match [an] E-Filing project" she had previously managed, and asked why she could not be appointed as manager of the APEIS project.  *Id.*  If she could not have that role, she asked for front pay as an equitable remedy.  *Id.* at 2.  She concluded that "[w]e should talk" because "[t]ime is running fast."  *Id.*

The DOT construed Young's email as a rejection of the position it had intended to place her in, and processed a payment of back pay on May 2, 2017, but did not reinstate her.  *See* Mehta Decl. Ex. H at 5.[10]  Schmitt states that since the position that was offered to her had been created specifically to account for the DOT's legal obligation to reinstate her, it was not filled by any other employee.  Schmitt Decl. ¶¶ 15, 16.

Young filed a petition for enforcement, arguing that the position offered in 2017 was not equivalent to the position she had previously held, and thus did not comply with the relief ordered by the EEOC.  *See generally* Mehta Decl. Ex. H.  The EEOC rejected that argument, holding that—in part due to changing technology—the position was sufficiently similar to be "equivalent considering the circumstances."  *Id.* at 8.  It determined that Young was "not necessarily [entitled to] her *desired* position" managing APEIS.  *Id.*  The EEOC also found that Young rejected the position offered, and thus was not entitled to further relief except for a small amount of back pay that had been erroneously withheld, as well as documentation related to pay during the period she was employed at GIS.  *Id.* at 8–9.

Schmitt states that APEIS was never a discrete project with an individual manager, but instead is a term OAI uses "to describe its overall system for required security assessments."

---

[10] Young raised arguments in her brief and at the hearing that the DOT in fact put her back on payroll in 2017, and that it later processed a "voluntary retirement" that Young had not agreed to.  *See* Opp'n at 23.  The Secretary disputes those assertions.  The Court finds this dispute irrelevant to the outcome of the present motion, and does not reach the question of whether Young has presented sufficient evidence to support her view of these events.

United States District Court
Northern District of California

Schmitt Decl. ¶ 15.  Both Young and Schmitt rely on a 2015 email explaining the meaning of

APEIS, which reads in relevant part:

> As some of you know, some of us are involved in work related to preparing documents needed for a security assessment of our airline data systems, this assessment is needed in order to obtain an official "Authority to Operate"
>
> As part of this effort we are officially combining our existing systems: "ARDIS" and "TRANSTATS", to become subsystems, along with eSubmit, DA eProcess, and the OAI data warehouse.
>
> Our "Overall" system will now be known as:
> The Airline Performance and Economic Information System (APEIS)
>
> Here are the descriptions of our subsystems, as was given to the consultants who will perform the security assessment:
>
> The Airline Performance and Economic Information System (APEIS) collects, validates and disseminates airline data reported by U.S. and Foreign Carriers . . . .

*Id.* ¶ 15 & Ex. 5; Opp'n at 13–14 & Ex. 23.  The email goes on to explain the five component

"subsystems" of APEIS.  Schmitt Decl. Ex. 5; Opp'n Ex. 23.  William Chadwick, who has served

as director of OAI from 2012 through this litigation, testified similarly to Schmitt that OAI coined

the term APEIS when "[w]e were told we had to have a name for our system just as a title for this

report and that's what we came up with," and that APEIS is not a "project" in any meaningful

sense with plans, goals, or milestones, but instead "an umbrella term to refer to all of our IT

systems."  Opp'n Ex. 30 (Chadwick Dep.) at 11:15–13:11

### 3.    Other Hires at OAI

Young contends that two other employees hired after she accepted the VSIP offer are

relevant to her non-selection claim: Robert Nazareth and Niranjan Miryala.[11]  Young asserts that

she is 11 years older than Nazareth and 17 years older than Miryala, and while she cites no

---

[11] Young's opposition brief also includes one passing reference to Nina Tatiyanina, *see* Opp'n at 20–21, another employee who was hired by OAI and apparently came up during discovery as potentially relevant, but Young does not address or dispute the Secretary's positions that: (1) her complaint asserts no claim related to Tatiyanina; and (2) Young cannot show Tatiyana (who was hired to a lower grade GS-13 position before Young accepted the VSIP offer) was hired instead of Young.  *See* Mot. at 19 n.5; *see generally* Opp'n.  Based on Young's opposition brief, the Court understands Young to be pursuing a non-selection claim founded at least in part on the hiring of Nazareth and Miryala, and not based on Tatiyanina.

United States District Court
Northern District of California

1    evidence to support that, the Secretary does not move for summary judgement on that basis. *See*

2    Opp'n at 22.

3         Nazareth was hired in 2016. *See* Schmitt Decl. ¶ 18. In November of 2015, Chadwick

4    submitted for approval a position description for a new GS-14 role, which the Secretary asserts

5    was the position given to Nazareth. Opp'n Ex. 18 at DT000060. It is not entirely clear from the

6    record whether that document actually pertained to the same position Nazareth filled, or if so,

7    whether the position was intended for Nazareth at that time. The position description, a vacancy

8    announcement, and similar documents were revised over the following months. *See, e.g.*, *id.* at

9    DOT000083–84.

10        On March 10, 2016—the same day Schwartz first offered a position to Young to be

11   reinstated—Chadwick (the OAI director) emailed Schwartz, stating that he believed she had

12   spoken with Schmitt "earlier this week about the possibility of Robert Nazareth transferring" from

13   another DOT division to OAI, and asked if she had a chance to determine whether that was

14   possible. *Id.* at DOT000104. Schwartz said that she was not aware of that transfer but someone

15   else in her office might be, and Chadwick proceeded over the following week to coordinate with

16   other human resources employees on approving the transfer. *Id.* at DOT000103–04.[12] On March

17   16, 2016, Chadwick emphasized that work related to filling the new position was a high-priority

18   request that should be "expedite[d] however possible," and confirmed that it was for a specific

19   person (Nazareth). *Id.* at DOT000102. On March 24, 2016, Human Resources Specialist Lisa

20   Hudnell confirmed that Nazareth was "eligible for the noncompetitive reassignment," and

21   Chadwick directed her to contact Nazareth and offer him the position. *Id.* at DOT000118.

22   Nazareth accepted that offer the next day. *Id.*

23

24   ───────────────

     [12] Also on March 10, 2016, someone within the DOT raised concerns about hiring someone to a
25   GS-14 position after BTS's VSIP plan had stated that GS-14 employees who accepted retirement
     offers would be replaced at lower grades, but when Schmitt and Chadwick explained that this was
26   a new position rather than a vacated position, no OAI employees accepted VSIP offers, and all
     BTS employees who accepted in other offices were replaced at lower grades, the process was
27   allowed to move forward. Opp'n Ex. 18 at DOT000124–25. It is not entirely clear whether this
     conversation pertained to the position given to Nazareth or to another new GS-14 position
28   (perhaps the position that Miryala later applied for and obtained), but that issue is not relevant to
     the outcome of the present motion.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Chadwick testified that OAI hired Nazareth based on his knowledge of and experience

2    with airline data, his broad familiarity with "all the datasets" and "how they fit together," and the

3    fact that he was "a very skilled programmer" capable of handling data requests.  Opp'n Ex. 30

4    (Chadwick Dep.) at 35:20–36:12.  He noted that OAI had seen an "exodus" of employees well

5    versed in airline data, and while the remaining employees were knowledgeable about their specific

6    responsibilities, OAI "needed some help" with "people that had general knowledge of all the

7    systems and how they interacted."  *Id.* at 20:18–21:2; *see also id.* at 36:2–9.  Nazareth's position

8    description included provided expert assistance with airline data programs; analyzing their

9    performance; applying expertise in database programming, relational database tools, statistical

10   analysis, and other tools; serving as the "Contract Officer's Representative (COR)" for contracts

11   related to OAI databases; participating in modernization of aviation data systems; and "plan[ning]

12   and direct[ing] IT policies and programs" related to data administration, among other duties.

13   Schmitt Decl. Ex. 7.

14        Through and after Nazareth's transfer, DOT personnel continued to work on a vacancy

15   announcement for another GS-14 IT Specialist position.  Miryala, who had "worked with OAI for

16   over a decade" as a contractor, applied in the summer of 2016 for the open GS-14, for which he

17   interviewed and was selected over other candidates.  Schmitt Decl. ¶ 19; *see* Opp'n Ex. 18 at

18   DOT000162 (August 2016 emails discussing interviews of Miryala and others).  Miryala accepted

19   the position in October of 2016, with a start date at the end of that month.  Opp'n Ex. 18 at

20   DOT000173.  His position description included server maintenance; responsibilities related to

21   networking, file systems, and redundancy; troubleshooting hardware and software problems;

22   setting data processing priorities; participating in modernization of aviation data systems; and

23   planning and developing new data administration systems, among other duties.  Schmitt Decl. Ex.

24   8.

25        According to Schmitt, BTS typically hired employees "into a position, job series, and

26   grade level that broadly defines their function," and then informally assigns and reassigns "who is

27   responsible for particular projects or work depending on office needs, staff availability, and other

28   workload demands."  Schmitt Decl. ¶ 12.

United States District Court
Northern District of California

1    Nazareth worked on an effort to modernize OAI's IT systems "to improve data quality and

2    timeliness by reducing or eliminating manual steps, reduce costs by consolidating and

3    streamlining hardware and software requirements, and minimize disruptions from the forthcoming

4    move of IT services," which had begun in 2012 and, according to a July 11, 2017 email from Rolf

5    Schmitt, was at the time expected to be completed twelve weeks from the date of Schmitt's email.

6    SAC Ex. 38.[13]  Schmitt stated in that email that Nazareth took over the overall modernization

7    project when he was transferred to OAI.  *Id.*  Chadwick testified that Nazareth and Miryala were

8    both assigned to manage some of the projects associated with that larger modernization.  Opp'n

9    Ex. 30 (Chadwick Dep.) at 28:20–24.  One of the projects Nazareth managed within the overall

10   modernization effort related to airline traffic, which was completed around 2019.  *Id.* at 29:19–

11   30:3.  Miryala managed other late-stage projects in the modernization effort, including moving off

12   of servers and transferring data to the cloud.  *Id.* at 30:8–17.

13       Nazareth left OAI at some point for what Chadwick understood to be "a better opportunity

14   with a different office within BTS."  *Id.* at 36:14–20.  Chadwick believed that Nazareth remained

15   at OAI for more than one year.  *Id.*

16   **C.    The Parties' Arguments**

17       **1.    The Secretary's Motion**

18       The Secretary moves for summary judgment on both of Young's remaining claims.  *See*

19   *generally* Mot. (dkt. 118).  With respect to constructive discharge, the Secretary argues that Young

20   relies largely on conduct that ended years before her retirement, while several decisions from the

21   Ninth Circuit and one from this district have rejected constructive discharge claims based on

22   conduct occurring mere months before a plaintiff's retirement.  *Id.* at 13–14 (citing *Poland v.*

23   *Chertoff*, 494 F.3d 1174, 1177–85 (9th Cir. 2007); *Manatt v. Bank of Am., NA*, 339 F.3d 792, 796–

24   804 (9th Cir. 2003); *Montero v. AGCO Corp.*, 192 F.3d 856, 861 (9th Cir. 1999); *Steiner v.*

25   *Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994); *Gowan v. Stryker Corp.*, No. 20-cv-

26

27   _____

28   [13] The Secretary objects to the admissibility of this email on the basis that it constitutes settlement discussions and is irrelevant and unduly prejudicial.  Reply at 12.  The Court assumes for the sake of argument that it is admissible.

00339-BLF, 2021 WL 3403150, at *2–3, 8 (N.D. Cal. Aug. 4, 2021)).  According to the Secretary, Young praised her direct and indirect supervisors in the years between 2008 and her 2015 retirement, and has not alleged that they discriminated against her.  *Id.* at 14–15.  The Secretary contends that Young's decision to remain working at the DOT for several years and ultimately retire in exchange for a monetary payment is not compatible with her claim for constructive termination.  *Id.* at 15–16.  The Secretary asserts that Young was not singled out for the voluntary retirement offer, and cites caselaw holding that the high standard of constructive discharge is not satisfied by demotions, reorganizations, or offers of voluntary early retirement—at least absent evidence that the offer was an ultimatum in disguise.  *Id.* at 16–18.

The Secretary understands Young's non-selection claim as pertaining to the positions later given to Robert Nazareth and Niranjan Miryala, and to the purported role managing the Airline Performance and Economic Information System ("APEIS"), which the Secretary contends never existed as a discrete project with a single manager.  *Id.* at 18, 21–22.  The Secretary argues that Young never applied for any open position, and Nazareth and later Miryala had a different, lower-grade role than Young ever occupied or was considered for.  *Id.* at 20–21.  The Secretary therefore argues that Young has not met her burden to show a prima facie case of discrimination in not selecting her for any role.  *See id.* at 20–22.  Even if she met that burden, the Secretary contends that the DOT had legitimate reasons for its hiring decisions in that it offered her a position specially created for her (except when it was seeking clarification as to the effect of her retirement) which she ultimately rejected, and because the purported role of a manager of APEIS never existed.  *Id.* at 22.  The Secretary argues that Young has not identified any evidence of pretext to rebut the legitimate reasons for the DOT's decisions.  *Id.* at 23–24.

### 2.    Young's Opposition

Young argues that the effects of her earlier discriminatory transfer to GIS were ongoing at the time of her retirement in that she was still assigned to that unsuitable position, distinguishing her constructive discharge claim from the cases cited by the Secretary where gaps in time between discrimination and resignation barred a claim.  Opp'n at 15.  She asserts that the work she did for Williams at NTL and her nomination of Hu and Schmitt for an award in 2014 arose from her

United States District Court
Northern District of California

desire to reach a cooperative solution.  *Id.* at 16.  Young contends that her exploration of potential

retirement was normal for someone her age, that she purchased the house in California for a

favorable price in 2009 jointly with her daughter and son-in-law (who remained co-owners with

her until 2016) as a matter of prudent family planning, and that her desire to return the VSIP funds

if reinstated to a more suitable position shows that she accepted the offer because of her poor

working conditions, not for the incentive payment or because she would prefer to retire

permanently.  *Id.* at 17–18.

Young suggests that her position at GIS was targeted for the VSIP offer and that the

Secretary's explanation that all GS-14 employees and non-supervisory GS-15 employees received

the same offer is "concocted."  *Id.* at 18–19.  It is not entirely clear from her brief whether Young

disputes the fact of whether all such employees received VSIP offers or whether she questions the

rationale for choosing that set of employees.  *See id.*  Young contends that other factors were also

relevant, and that she would not have received a VSIP offer if she had remained in her previous

GS-15 position at OAI even though that position was also non-supervisory.  *Id.*

Turning to non-selection, Young argues that merely holding a newly-created position open

for her did not comply with the DOT's obligation to restore her to the position she would have

been in absent discrimination.  *Id.* at 20.  She disputes Schmitt's declaration that BTS employees

were assigned tasks informally, asserting instead that position descriptions formally defined their

roles under Office of Personnel Management policy.  *Id.*  In Young's view, it was irrelevant that

Miryala and Nazareth did not take the particular allocated position that had been set aside for her;

what mattered was that they took the responsibilities she believed she should have been given,

leaving only a role with no meaningful responsibility available in 2017 after the EEOC clarified

that the DOT must still reinstate her despite her retirement.  *See id.* at 21–22.  Young also asserts

that a position of APEIS manager existed and should have been made available to her, and that the

DOT concealed documents pertaining to APEIS from her during much of discovery.  *Id.* at 23–24.

In Young's view, Nazareth served as the APEIS project manager and Miryala later replaced him.

*Id.* at 24.

Young also asserts in her opposition brief that she was placed back on OAI payroll in 2017

20

1    and took no action after that to voluntarily retire, but was treated as if she voluntarily retired in

2    February of 2019, citing an email where a human resources specialist asked her to submit

3    retirement forms.  *Id.* at 23 (citing Opp'n Ex. 32).  Young does not explain what effect that would

4    have, if true, on her claims for constructive discharge and non-selection.  *See id.*

5              **3.       The Secretary's Reply**

6              The Secretary argues again in his reply that Young cannot show a sufficiently intolerable

7    workplace to support a constructive discharge claim, citing evidence including Young remaining

8    at GIS for years before retiring, her praise of her supervisors, and her deliberative process in

9    considering whether to retire.  Reply (dkt. 126) at 2–4.  According to the Secretary, Young's

10   circumstances when she retired long after her discriminatory transfer were not comparable to cases

11   where courts found constructive discharge claims viable in light of ongoing patterns of

12   discrimination and harassment.  *Id.* at 4.

13             The Secretary contends that Young has offered no evidence to support her view that her

14   GIS position was targeted for a VSIP offer or to rebut the Secretary's evidence that all GS-14 and

15   non-supervisory GS-15 employees at BTS received VSIP offers.  *Id.* at 6.  The Secretary also

16   argues that the VSIP offers were not coercive.  *Id.*  According to the Secretary, Young has not

17   shown sufficient aggravating factors beyond a typical discrimination claim to support constructive

18   discharge.  *Id.* at 6–7.

19             With respect to Young's non-selection claim, the Secretary argues that she cannot establish

20   a prima facie case because she has not specified an open position in 2016 or 2017 for which she

21   was qualified and that she sought but was denied.  *Id.* at 7–8.  The Secretary contends the DOT

22   tried to craft a position for Young and that Nazareth and Miryala's hiring did not affect Young's

23   position.  *Id*. at 8.  According to the Secretary, Young offers no evidence of pretext, *id.* at 9–10,

24   11, and her arguments that the DOT did not comply with the EEOC's orders are not relevant to her

25   claim for discriminatory non-selection, *id.* at 11–12.

26             The Secretary disputes Young's assertion that she was added to OAI's payroll and was no

27   longer retired in 2017.  *Id.* at 10–11.  The Secretary also objects to the admissibility of a number

28   of exhibits that Young cites in her opposition.  *Id.* at 12–13.

United States District Court
Northern District of California

### D.    Post-Reply Filings

After the normal course of briefing closed with the Secretary's reply, Young filed a declaration attaching the same exhibits as her opposition brief and including a short description of each exhibit.  Dkt. 127.  That declaration adds no new substantive evidence beyond what Young had already timely filed.  As stated in a footnote above, the Court therefore excuses Young's failure to file that declaration with her opposition brief.

Young later filed a second declaration attaching deposition testimony and a declaration by a doctor who treated her.  Dkt. 129.  This Court's local rules generally do not permit filing additional evidence after a reply brief.  Civ. L.R. 7-3.  Young offers no excuse for her failure to present this new evidence with her opposition brief in the normal course, nor any explanation of how it relates to her arguments.  The Court declines to consider Young's second post-reply declaration or the evidence attached to it.

Young also moved to file a surreply addressing three issues purportedly raised for the first time in the Secretary's reply: (1) the Secretary's position that Young's remaining claims are not a de novo trial of the 2008 discrimination already addressed by the EEOC; (2) whether evidence that the Secretary characterizes as discussing settlement is admissible; and (3) whether various other evidence is admissible.  Dkt. 128.  The Secretary opposes that administrative motion, *see* dkt. 131,

"Civil Local Rule 7-3(d) provides that, '[o]nce a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval,' except to object to reply evidence or to provide a statement of recent decision. . . .  Courts are required to afford pro se litigants additional leniency, but such leniency does *not* extend to permitting surreplies as a matter of course."  *Hall v. City & County of San Francisco*, No. 17-cv-02161-JST, 2017 WL 5569829, at *4 (N.D. Cal. Nov. 20, 2017) (cleaned up).  Of the issues raised in Young's motion for leave, the Secretary's position that Young's remaining claims do not seek de novo review was stated clearly in his motion, and thus was not a new issue in his reply.  *See* Mot. at 2.  The remaining issues are not relevant to the Court's conclusions.  The Court assumes for the sake of argument that all evidence Young submitted is admissible or could be presented at trial in an admissible form.  Young's administrative motion for leave to file a surreply is therefore DENIED.

United States District Court
Northern District of California

### III.   ANALYSIS

#### A.   Legal Standard

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .").  The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Thus, it is not the task of the court "'to scour the record in search of a genuine issue of triable fact.'" *Id.* (citation omitted); *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

"[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).  Neither conclusory, speculative testimony in declarations nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982); *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378

(2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

### B.   Constructive Discharge

The burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to motions for summary judgment on Title VII and ADEA claims.  *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010) (addressing Title VII); *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (addressing the ADEA).

> Under this analysis, plaintiffs must first establish a prima facie case of employment discrimination. If plaintiffs establish a prima facie case, the burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. If defendant meets this burden, plaintiffs must then raise a triable issue of material fact as to whether the defendant's proffered reasons for their terminations are mere pretext for unlawful discrimination.
>
> To establish a prima facie case, plaintiffs must offer evidence that gives rise to an inference of unlawful discrimination. Plaintiffs may establish a prima facie case based on circumstantial evidence by showing: (1) that they are members of a protected class; (2) that they were qualified for their positions and performing their jobs satisfactorily; (3) that they experienced adverse employment actions; and (4) that similarly situated individuals outside their protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.

*Hawn*, 615 F.3d at 1155–56 (cleaned up).

A plaintiff who chose to leave a job may, in some circumstances, still pursue a Title VII or ADEA claim based on a theory of constructive discharge.

> "A constructive discharge occurs when a person quits his job under circumstances in which a *reasonable person* would feel that the conditions of employment have become intolerable." *Draper* [*v. Coeur Rochester, Inc.*, 147 F.3d 1104, 110 (9th Cir. 1998)] (emphasis added). Thus, an employee need not demonstrate that his employer intended to force him to resign, but merely that his conditions of employment were objectively intolerable. *Id.*

*Lawson v. Washington*, 296 F.3d 799, 805 (9th Cir. 2002) (addressing Title VII); *see Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (addressing the ADEA).  To support such a claim,

United States District Court
Northern District of California

working conditions must have "deteriorate[d], as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Poland*, 494 F.3d at 1184 (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000)). "[C]onstructive discharge cannot be based upon the employee's subjective preference for one position over another." *Id.* at 1185 (citation and internal quotation marks omitted).

The Ninth Circuit has "set the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable." *Id.* at 1184. "Whether working conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question for the jury," *Wallace v. City of San Diego*, 479 F.3d 616, 626 (9th Cir. 2007), but in appropriate circumstances can also be resolved as a matter of law, *see Poland*, 494 F.3d at 1185.

The Secretary argues here that the VSIP offer that prompted Young to retire was not discriminatory, and that Young's work was not objectively intolerable.

Young asserts that VSIP offers were not extended to all GS-14 and non-supervisory GS-15 employees at BTS, but instead were targeted based on criteria that included her position at GIS but would not have included her former position at OAI. Opp'n at 19. The evidence she cites does not support that assertion—it is a proposal document explaining the *reasoning* for offering early retirement to all GS-14 and non-supervisory GS-15 employees, which included creating vacancies for employees with new skills and replacing vacant positions with lower paygrades to reduce cost, not a set of other criteria for *which* GS-14 and non-supervisory GS-15 employees would receive offers. Opp'n Ex. 27 at DOT002309.[14] Young also asserts that an automated tool that Schmitt

---

[14] The Secretary objects to the admissibility of Exhibit 27 as lacking personal knowledge or authentication and containing hearsay, and to the admissibility of Exhibit 28 as lacking personal knowledge or authentication. Reply at 12. The Court assumes for the sake of argument that these exhibits are admissible.

United States District Court
Northern District of California

1    used to identify target positions was overinclusive in that it returned all GS-14 and GS-15

2    employees and required manual review to exclude supervisory GS-15 employees, but even if so,

3    that does not show that anyone except supervisory employees was excluded by that manual

4    review.  *See* Opp'n at 19 & Ex. 28.  Any reasonable jury would find on the record available that

5    VSIP offers were approved and presented to all GS-14 and non-supervisory GS-15 employees of

6    BTS, and that Young received an offer because she was a GS-15 non-supervisory employee.  *See*

7    Schwartz Decl. ¶¶ 7–9 & Exs. 7, 8; Schmitt Decl. ¶¶ 6, 8.

8         To the extent Young argues that those criteria were used but were "concocted," the only

9    grounds she cites for that conclusion—that a different office used different criteria, and that

10   Schmitt did not specifically explain why supervisory GS-15 employees were not included—do not

11   evince discrimination on account of race or age.  Opp'n at 19.  Young offers no evidence that

12   younger or non-Asian employees were treated differently with respect to VSIP offers, nor

13   evidence of any other circumstances that would support an inference of discrimination.  The

14   Secretary is entitled to summary adjudication that the DOT did not extend a VSIP offer to Young

15   because of her race or age.[15]

16        The parties have not sufficiently addressed the legal question of whether that ends the

17   inquiry.  Young was only in the GIS role because of a discriminatory transfer.  If Young's job was

18   already severely unpleasant due to a reassignment to GIS on account of race and age, and the non-

19   discriminatory VSIP offer—in conjunction with existing conditions caused by discrimination—

20   moved the needle from merely unpleasant to objectively intolerable, an argument could be made

21   that the resulting intolerable work environment was caused by discrimination, because the VSIP

22   offer alone would not have been intolerable but for the lingering effects of the earlier

23

24   _____

     [15] The Secretary asserts that Young's opposition brief concedes that VSIP offers were not based
25   on age or race.  Reply at 5 (citing Opp'n at 19).  The intended meaning of that part of Young's
     brief is not entirely clear.  *See* Opp'n at 19 ("Based on the above declaration, Defendant used
26   grade distribution and the VSIP tool and identified positions (not employees) based on extensive
     analysis (Schmitt Decl. ¶ 6), not based on age or race. (MSJ at 21) Plaintiff did not claim that Ms.
27   Hu and Mr. Schmitt based their identification of positions on race or age nor intended to check the
     non-target employees for GS14 and nonsupervisory GS15.").  Given that Young goes on to assert
28   that Schmitt's analysis was "concocted," the Court assumes for the sake of argument that she did
     not intend to concede this point.

1   discrimination.  The Court is not aware of precedent squarely addressing whether such a theory is

2   viable.  The Court need not resolve that question, however, because Young has not offered

3   evidence from which a reasonably jury could conclude that her job was objectively intolerable.

4          In *Poland*, the plaintiff had been the Resident Agent in Charge of the U.S. Customs

5   Service's office in Portland, Oregon.  494 F.3d at 1178.  He was reassigned to Vienna, Virginia,

6   resulting in separation from his family, for a non-supervisory position that he considered to be a

7   "career-ender."  *Id.* at 1178, 1184, 1186.  He successfully proved at a bench trial that the transfer

8   was made in retaliation for activity protected under the ADEA, and also prevailed in the trial court

9   on a constructive discharge claim.  *Id.* at 1179.  The Ninth Circuit affirmed the determination of

10   retaliation, but reversed as to constructive discharge.  Despite the plaintiff's loss of a supervisory

11   role and transfer to a non-supervisory job across the country where he had no reasonable chance

12   for a promotion, the Ninth Circuit held as a matter of law that his working conditions were not

13   sufficiently egregious that a reasonable person in his position would have felt compelled to resign.

14   *Id.* at 1186 & n.8.  The court took into account that Poland stayed in his job for five months before

15   deciding to take early retirement and another three months after reaching that decision ("As a

16   matter of law, these are not the actions of someone who finds his working conditions so

17   intolerable that he felt compelled to resign."), that customs agents signed waivers acknowledging

18   that they could be transferred anywhere, that the plaintiff suffered no loss of salary or benefits, and

19   that he never testified that he felt forced to resign.  *Id.* at 1185–86.

20          In *Gowan v. Stryker Corp.*, the plaintiff alleged that she was constructively discharged due

21   to sexual harassment.  No. 20-cv-00339-BLF, 2021 WL 3403150, at *8 (N.D. Cal. Aug. 4, 2021).

22   On summary judgment, the court held as matter of law that she could not show constructive

23   discharge where, upon resignation, she wrote to a supervisor that she loved the company and the

24   business unit she worked in, continued to work for two more months after deciding to retire, and

25   continued to apply for other positions at the company.  *Id.*

26          In *Manatt v. Bank of America, NA*, the Ninth Circuit affirmed summary judgment for the

27   defendant, holding that a "constructive discharge claim is untenable in light of the fact that the

28   alleged racially offensive work environment ended in March 1998, but [the plaintiff] did not quit

United States District Court
Northern District of California

27

working for the Bank until April 21, 2000," even though the plaintiff had been demoted from a trade finance specialist to an administrative assistant and remained in that demoted position until her resignation.   339 F.3d 792, 796, 804 (9th Cir. 2003).

Here, Young found her post-transfer work unsuitable as compared to her previous position, but "subjective preference for one position over another" and mere "evidence of transfer and demotion is insufficient, as a matter of law, to establish a constructive discharge." *Poland*, 494 F.3d at 1184–85.  There are certainly indications that Young was unhappy at GIS: she was underutilized, supervisors at times neglected her, she felt lonely, and she was uncertain about her future.  But on the other hand, in the period leading up to her retirement, she was spending most of her time on work at NTL that interested her, she liked her outgoing official supervisor at GIS (Lewis) and her de facto supervisor at NTL (Williams), and—at least at the time—she respected the new leadership of the larger BTS organization (Hu and Schmitt).  Upon her retirement, she wrote notes to Williams, Hu, and Schmitt expressing how much she enjoyed working with them, never suggesting that she felt compelled to resign due to intolerable conditions. *Cf. Gowan*, 2021 WL 3403150, at *8 (holding that a similar note was incompatible with a constructive discharge claim).  "Also, although it is not a dispositive factor, the fact that [Young's] transfer resulted in no decrease of salary or benefits weighs against a finding of constructive discharge." *Poland*, 494 F.3d at 1185.

Unlike in *Poland*, where the plaintiff's continued work for a period of months after he was transferred demonstrated "as a matter of law" that he did not find his working conditions intolerable, *id.*, Young remained in her post-transfer position for *years* before deciding to retire.[16] In response, she contends that the VSIP offer was the final straw that broke her resolve, because it humiliated her and instilled fear that she would be reassigned to an even worse position.  A decision by the First Circuit has addressed the significance of retirement incentive offers in detail,

---

[16] Some cases have recognized that constructive discharge claims may be viable despite a plaintiff having remained in their position after initial incidents of discrimination if the plaintiff is subject to an ongoing pattern of discrimination.  *E.g.*, *Wallace v. City of San Diego*, 479 F.3d 616, 628 (9th Cir. 2007).  Here, however, Young has offered no evidence that she faced further discrimination between the events surrounding her 2008 transfer and her 2015 retirement.

holding that "[t]o transform an offer of early retirement into a constructive discharge, a plaintiff must show that the offer was nothing more than a charade, that is, a subterfuge disguising the employer's desire to purge plaintiff from the ranks because of his age."  *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 480 (1st Cir. 1993).  That court credited statements on the face of the incentive offer that it was voluntary, and the fact that employees had time to consider their decisions, to hold that the offers were not coercive and affirm summary judgment in favor of the employer, even though the defendant made clear that it "would likely furlough a number of employees if not enough workers elected to depart voluntarily."  *Id.* at 480.  Here, as in *Vega*, the VSIP offer stated that it was voluntary, and Young had time to consider her decision.  Schwartz Decl. Ex. 10.  Young took advantage of that time, consulting with her husband and asking a human resources employees questions about retirement benefits.  *Id.* ¶ 10 & Exs. 11, 14; Mehta Decl. Ex. E (Young Dep.) at 57:18–21.  Moreover, unlike in *Vega*, the DOT made clear that it was not considering an overall reduction in force at the time it made the offers.  SAC Ex. 26 at 2.

To the extent there is any doubt as to whether the VSIP offer so humiliated and demoralized Young as to render her work intolerable, her contemporaneous description of her decision puts that to rest.  Young wrote to Schmitt and Hu that conditions at BTS had improved significantly under their leadership, and that whether to accept VSIP was a "difficult decision" that she thought about for days after receiving the offer.  Schmitt Decl. Ex. 4.  Perhaps more significantly, in an email sent the day after she retired praising the assistance provided by a human resources specialist, Young wrote that she had "been expecting for retirement" and "waiting for VSIP," but that when she received the offer she "hesitated" because she was "too used to employment life."  Schwartz Decl. Ex. 14.  Despite the Secretary raising that email in his motion as evidence that Young's working conditions were not intolerable, Mot. at 8, Young does not address it at all in her opposition.  Considering retirement but waiting for a monetary incentive, and even then finding the decision difficult, is not compatible with employment conditions so intolerable that a reasonable employee would feel compelled to leave.  Moreover, while Young argues that her willingness to return the VSIP payment in return for a better job indicates that she did not actually want to retire, Opp'n at 17–18, that only shows that she would have considered

*some* jobs preferable to retirement with incentive pay, not that her job at the time of her retirement was either subjectively or objectively intolerable.

As a matter of law, Young's working conditions were not sufficiently intolerable to support constructive discharge. The Secretary's motion for summary judgment is GRANTED as to this claim.

## C. Non-Selection

For the purpose of summary judgment, Young's non-selection claim under the ADEA is subject to the same burden-shifting framework discussed above in the context of her constructive discharge claim. She "may establish a prima facie case of discrimination in violation of the ADEA by producing evidence that . . . she was (1) at least forty years old, (2) qualified for the position for which an application was submitted, (3) denied the position, and (4) the [position] was given to a substantially younger person." *Shelley v. Geren*, 666 F.3d 599, 608 (9th Cir. 2012). If Young makes that showing, the burden shifts to the Secretary to articulate a legitimate non-discriminatory reason for Young's non-selection, which Young can overcome by showing that the stated reason was pretextual.

This case is unorthodox for a non-selection claim, in large part because of the unique circumstances under which Young was pursuing a position at OAI during the period at issue. Unlike the typical plaintiff asserting such a claim, who is usually an outsider applying for an open position, Young was a former OAI employee pursuing reinstatement through administrative proceedings. The Secretary contends that Young cannot meet the requirement that she applied for an open position for which another person was selected, because she did not apply for a position at all.

Young ultimately obtained an order requiring the DOT to reinstate her, which was restated in the EEOC's order denying reconsideration and again in its order on the DOT's petition for clarification, as relief for discrimination occurring in and around 2008. Whether the DOT complied with the specific terms of that order (in each of its successive forms) is not at issue here—that was the question in Young's unsuccessful administrative enforcement action, where the EEOC ultimately held that the DOT eventually complied through its 2017 reinstatement offer. If

Young believed that the relief the EEOC found sufficient to remedy her past discriminatory transfer was not adequate, her only recourse was a de novo discrimination claim reopening the question of whether the DOT discriminated against her in 2008 to begin with.  Young filed such a claim here, but has since stipulated to dismiss it.  Even if Young was correct that the DOT failed to meet its obligations under the EEOC's orders in 2016 or 2017, that does not show that it denied her a position based on her age at that time.

That said, the EEOC's reinstatement orders might still be relevant to a non-selection theory if, while the orders were outstanding, the DOT gave positions that could have satisfied those obligations to other candidates instead of Young.  Courts have rejected non-selection claims where plaintiffs expressed only a "general willingness to work," did not apply to any particular position, and made no showing regarding their qualifications for other positions or the circumstances under they were filled.  *See, e.g.*, *Aline v. Gen. Elec. Co.*, No. 95-20775 SW, 1997 WL 195435, at *3 (N.D. Cal. Apr. 16, 1997) (quoting *Taylor v. Canteen Corp.*, 69 F.3d 773, 780–81 (7th Cir. 1995)) (considering a claim for age discrimination under California law, which is in relevant respects similar to the ADEA).  Here, however, the EEOC's reinstatement orders required the DOT to find a position at OAI for Young.  Accordingly, to the extent it hired other employees to roles that might have fulfilled that obligation but did not hire Young, there is at least an argument for treating the EEOC's orders as equivalent to an application by Young for any position that would satisfy them.  If so, Young could perhaps show discrimination in choosing those other employees over her when the DOT had not yet reinstated her as ordered, or in offering them positions superior to what it offered her.

Nazareth and Miryala's hiring potentially fits that pattern.  Schmitt, Chadwick, and others at the DOT were obtaining approval for Nazareth's noncompetitive hiring, and were preparing vacancy announcements for the role that Miryala ultimately obtained, at the same time the DOT offered to reinstate Young in March of 2016 after the EEOC denied reconsideration.  Several months later, Nazareth and Miryala had been hired, while Young was not reinstated.

The Secretary is correct that summary judgment can be appropriate where a plaintiff "fail[s] to show that [the defendant] continued to seek applicants from persons of his

31

qualifications." *See Cambra v. Chevron Int'l Expl. & Prod.*, 318 F. App'x 488, 491 (9th Cir. 2008). But here, the DOT hired another candidate (Nazareth) at the same time it was considering reinstating Young (but did not do so), and also knew at that time it had need for another position for which it later took applications and hired Miryala. The Secretary also asserts that Nazareth and Miryala were not given the same GS-15 position that was offered to Young, but cites no authority holding that the label given to the job is dispositive. Mot. at 20. Schmitt's declaration that work at BTS was assigned informally based on need and availability tends to undercut the importance of formal job descriptions. Schmitt Decl. ¶ 12.

The more relevant question would seem to be whether Nazareth and Miryala had similar qualifications to Young, and whether the DOT could have hired Young—whom it was already considering hiring based on the EEOC's mandate to reinstate her—instead of either of those younger candidates to fill the same need. While Nazareth and Miryala were hired to lower-grade GS-14 positions than the GS-15 level to which Young was entitled, the DOT was already faced with creating a GS-15 position for Young that it did not think it needed at all, so if she was qualified for one of the roles that OAI actually needed, the DOT could perhaps have hired her for that position at an inflated grade level, rather than create a separate redundant position.

There is some indication that Young's responsibilities in her previous role at OAI (including database management, modernization projects, and managing contractors) overlapped at least to some degree with Nazareth and Miryala's stated job descriptions, and Young's past work could potentially be construed as similar to the broad experience with airline data that Chadwick stated was a major reason for hiring Nazareth. If Young was similarly situated to them and qualified for the jobs that the DOT gave them at OAI, that could support an inference that the decision of whom to hire was based on age. Of course, there are also some differences in these employees' experience and qualifications, but the Secretary's motion for summary judgment did not squarely raise the questions of whether Young was similarly situated to Nazareth or Miryala or whether she was qualified to perform their jobs. The Court declines to construe the Secretary's general argument that Young cannot establish a prima facie case—which, as raised in his motion, focuses on superficial differences between the job title created for Young and the jobs given to the

1    younger employees—as seeking summary judgment on the more specific questions of whether

2    Young was similarly situated to those employees or qualified for their jobs.

3            But assuming for the sake of argument that Young could establish a prima facie case, the

4    Secretary has met his burden to show a nondiscriminatory reason she was not hired in 2016.  Upon

5    beginning to process Young's reinstatement, DOT personnel learned that doing so would require

6    complex unwinding of her retirement, and did not believe that process—or providing back pay

7    after Young voluntarily retired—was required by the EEOC's order.  Schwartz Decl. ¶ 16; *see*

8    SAC Ex. 31.  That assessment may have been incorrect, as the EEOC ultimately held, but it is not

9    inherently discriminatory on account of Young's age, and Young presents no evidence to support

10   an inference that the assessment or the petition for clarification were discriminatory.  Despite the

11   Secretary presenting in his motion this excuse for not following through on the 2016 offer, Mot. at

12   22, Young's opposition brief does not address it, and she identifies no evidence that would tend to

13   suggest it was pretextual.  *See* Opp'n at 20–25.

14           By 2017, when the DOT's obligation to reinstate Young despite her retirement had been

15   clarified by the EEOC, there is no indication of any open position besides the purpose-built job

16   that the DOT offered to Young.  Young does not identify any vacancies at that time or any

17   similarly situated Younger employees hired after that date.[17]  As for the purported position of

18   APEIS manager that Young sought as an alternative to the position offered to her in 2017, the

19   Court agrees with the Secretary that there is no evidence such a role existed.  But regardless, even

20   if—as Young suggests—Nazareth, Miryala, or some other employee held that role, the Secretary's

21   failure to *remove* someone from a role in order to give it to Young is not discriminatory.  Young

22   has not presented evidence sufficient to establish a prima facie case for non-selection after the

23   EEOC clarified the DOT's obligations in 2017.  Alternatively, the Secretary has offered a

24   legitimate non-discriminatory reason Young was not selected for a different position than what

25

26   _____

[17] If Young was correct that the position offered to her in 2017 was not sufficient to comply with
27   the EEOC's order, and no other sufficient position was available, then she might have been
     entitled to front pay as an alternative remedy for her discriminatory transfer in 2008.  But the
28   EEOC rejected that argument, and in any event, insufficient compliance with the EEOC's order
     would not in itself evince a separate act of discriminatory non-selection.

was offered in 2017 in that no such position was available, and Young has not rebutted that reason with any showing of pretext.

Beyond that point, Young does not assert that the DOT discriminated against her in failing to offer her a position any time after she declined to accept the position offered in 2017.  She has presented no evidence that she applied for a position, or that the DOT had any other reason to consider her for one, after the DOT concluded that its 2017 offer had fulfilled its responsibilities under the EEOC's reinstatement orders and the EEOC affirmed that conclusion on Young's petition for enforcement.

Accordingly, the Secretary is entitled to summary judgment on Young's non-selection claim.

## IV.    CONCLUSION

For the reasons discussed above, Young's motion for leave to file a surreply is DENIED, and the Secretary's motion for summary judgment is GRANTED as to the only remaining claims in the case.  The Clerk shall enter judgment in favor of the Secretary and close the case.

**IT IS SO ORDERED.**

Dated: December 19, 2022

_____
JOSEPH C. SPERO
Chief Magistrate Judge